ASTLEFORD EQUIPMENT
CO., INC., Appellant,

v.

NAVISTAR INTERNATIONAL TRANS-
PORTATION CORP., a Delaware
Corporation, Respondent.

No. C5–99–1612.

Court of Appeals of Minnesota.

May 30, 2000.

Robert L. DeMay, Elizabeth A. Cumming, Minneapolis, for appellant.

Frank A. Dvorak, Foley & Mansfield, Minneapolis, and Ezra D. Rosenberg, Dechert Price & Rhoads, Princeton, NJ, for respondent.

Considered and decided by
TOUSSAINT, Chief Judge, PETERSON, Judge, and FOLEY,* Judge.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

PETERSON, Judge

Respondent Navistar International Transportation Corporation manufactures and assembles medium- and heavy-duty trucks and truck parts and markets them under the International brand name. Appellant Astleford Equipment Company, Inc., is an International truck dealership located in Burnsville, Minnesota. After Navistar informed Astleford that it intended to authorize North Star Fleet Services, Inc. (NSF), to open an International truck dealership in Eagan, Minnesota, about nine miles from Astleford's location, Astleford brought this action against Navistar. Astleford sought a judgment declaring that to establish a new dealership in Eagan would (1) violate Minn.Stat. § 80E.14 (limitations on establishing or relocating new motor vehicle dealerships); (2) violate Minn.Stat. § 325E.0681, subd. 1 (requiring good cause for an equipment manufacturer to substantially change the competitive circumstances of a dealership agreement); and (3) breach the implied covenant of good faith and fair dealing included in the dealership agreement between Astleford and Navistar. The district court permitted North Star International Trucks (NSI), an International truck dealer located in Minneapolis, Minnesota, and NSF to intervene and assert cross-claims against Navistar.

The district court granted summary judgment in favor of Navistar on Astleford's claim for breach of the implied covenant of good faith and fair dealing, and Astleford's remaining claims were tried to the court. On the first day of trial, the district court vacated the order of intervention because NSI's and NSF's interests were adequately represented by Navistar. Following a five-day trial, the district court

concluded that establishing an International truck dealership in Eagan would not violate Minn.Stat. § 325E.0681, subd. 1, or Minn.Stat. § 80E.14 and issued an order for judgment in favor of Navistar. The district court denied Astleford's motion for amended findings or, alternatively, a new trial, and judgment was entered in favor of Navistar.

## FACTS

Navistar, the successor in interest to International Harvester, manufactures and assembles medium- and heavy-duty trucks and truck parts and markets them under the brand name International. Navistar markets its products through a nationwide network of dealers. Each dealer enters into a dealer sales/maintenance agreement with Navistar that establishes the rights and obligations of both Navistar and the dealer. Navistar assigns each dealer a nonexclusive geographical area called an area of responsibility (AOR), which is considered to be the dealer's primary area of responsibility but can be changed unilaterally by Navistar. Navistar judges each dealer, in part, by its performance in selling International trucks within the dealer's AOR. In its dealer agreements, Navistar expressly retains the right to sell its products within a dealer's AOR both directly and through other International dealers. Generally, all dealers are required to sell International parts and perform warranty services on both medium- and heavy-duty International trucks, and an individual dealer is authorized to sell either medium-duty or both medium- and heavy-duty new International trucks.[1]

Astleford has been in business since 1945. It originally dealt in farm implements manufactured by International Harvester and currently sells and services International and Isuzu trucks. The com-

---

1. Trucks are classified into eight categories based on gross vehicle weight (GVW). Trucks with a GVW between 16,001 and 33,000 pounds are in classes five through seven, and trucks with a GVW exceeding 33,000 pounds are in class eight. Generally, Navistar desig- nates trucks in classes six and seven as medi- um-duty trucks and trucks in class eight as heavy-duty. But, depending on how they are constructed, some of the trucks Navistar des- ignates as medium-duty can be classified as class eight trucks.

mercial new truck industry suffered a downturn during the early 1980s. In the Minneapolis/St. Paul area, only Astleford and one other independently owned International truck dealership survived the downturn. Navistar closed a company-owned dealership located in St. Paul and sold a company-owned dealership located in Northeast Minneapolis to NSI. In 1985, with Navistar's consent, Astleford relocated its dealership from Richfield to Burnsville.

Another major industry downturn began to affect Astleford in 1988 or 1989. During this economic downturn, Navistar sought to terminate Astleford's dealership. Astleford challenged the termination, and the parties agreed that Astleford's heavy-duty International truck dealership would be terminated, but it would retain its medium-duty International truck dealership. Since 1990, Astleford has been capable of acting and has expressed a willingness to act as a heavy-duty truck dealership, but Navistar has declined to reauthorize Astleford as a heavy-duty truck dealership.

NSI, an authorized medium- and heavy-duty International truck dealer is located in Minneapolis. In 1997, NSI's owner, Michael Gleeson, indicated to Navistar an interest in opening a secondary facility to be operated by NSF in Eagan. The Eagan site is about nine miles from Astleford's site and is within NSI's and Astleford's AORs. NSF sought authorization as a heavy-duty International truck dealer.

Navistar presented evidence that between 1994/1995 and 1996/1997, the market for heavy-duty trucks within NSI's and Astleford's AORs increased significantly. Citing testimony by Sandra Dawson, Astleford's owner, and Mark Johnson, Navistar's vice president, Navistar asserts that NSF will generate an increase in sales of International heavy-duty trucks, which, in turn, will benefit Astleford's parts and service business. But Dawson's testimony indicated that Astleford generally does not service heavy-duty trucks. Dawson testified that while it was possible that Astleford would derive parts and service business from NSF's heavy-duty truck sales, it was unlikely. Johnson testified that selling more heavy-duty trucks represented an opportunity to improve the market share for all International dealers.

## ISSUES

I. Did the district court err in finding that Navistar's approval of an International dealership in Eagan would not substantially change the competitive circumstances of Astleford's dealership agreement with Navistar?

II. Did the district court err in finding that Navistar demonstrated good cause under Minn.Stat. § 80E.14 for establishing the NSF dealership in Eagan?

III. Is Astleford entitled to a new trial because the district court erred in failing to compel NSI to provide Astleford with discovery concerning NSI's parts and service customers and a secondary facility located in Hudson?

IV. Is Astleford entitled to a new trial because the district court considered a market penetration analysis that was not prepared by Navistar until after trial?

## ANALYSIS

### I.

Statutory construction is a question of law subject to de novo review. *Wynkoop v. Carpenter*, 574 N.W.2d 422, 425 (Minn.1998). When a statute is unambiguous, the court must give effect to the statute's plain meaning. *Tuma v. Commissioner of Economic Sec.*, 386 N.W.2d 702, 706 (Minn.1986). But, when a statute is ambiguous, that is, when it is reasonably susceptible to more than one interpretation, the court must determine the probable legislative intent and construe the statute in a manner consistent with that intent. *Id.* In determining legislative intent, the court may consider the need for the law, the circumstances of its enactment, the purpose of the statute, the prior

law, if any, the consequences of an interpretation, the legislative history, and administrative interpretations of the law. Minn.Stat. § 645.16 (1998).

The Heavy and Utility Equipment Manufacturer and Dealers Act (HUEMDA) provides:

> No equipment manufacturer, directly or through an officer, agent, or employee may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause. "Good cause" means failure by an equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement, if the requirements are not different from those requirements imposed on other similarly situated dealers by their terms.

Minn.Stat. § 325E.0681, subd. 1 (1998).

■ Navistar argues that Minn.Stat. § 325E.0681 does not apply to this case because Navistar's dealership agreement with Astleford permits Navistar to appoint dealers anywhere, including within Astleford's AOR. In *Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. Partnership*, 977 F.Supp. 1386, 1391–93 (D.Minn.1997), the federal district court rejected this argument:

> On its face, it is evident that "of a dealership agreement" is intended to modify the phrase "substantially change the competitive circumstances." However, had the legislature intended to limit causes of action under this part of the statute to changes in the agreement or contract itself, it would have had no need to include the phrase "competitive circumstances" and simply could have required good cause by manufacturers to "substantially change a dealership agreement" or possibly, to "substantially change the competitive circumstances in a dealership agreement."
>
> The plain meaning of the word "circumstance" helps explain why the legislature may have included it in the stat-

ute. "Circumstance" is defined as "a specific part, phase, or attribute of the surroundings or background or an event, fact, or thing or of the prevailing conditions in which it exists or takes place." *Webster's Third New International Dictionary*, 1968. *Black's Law Dictionary* accordingly defines "circumstances" as "attendant facts" and "[t]he surroundings at the commission of an act[.]" * * * It is a maxim of statutory interpretation that "[a] word must be construed in accordance with its common and approved usage unless to do so would be inconsistent with manifest legislative intent." Construing "circumstances of a dealership agreement" in favor of dealers and according to its "common and approved usage" is hardly inconsistent with the manifest legislative intent of the statute, which was undeniably designed to protect dealers and distributors. Therefore, the Court finds that an actionable claim exists under the statute when a dealer alleges that a manufacturer has effectuated a "substantial change in competitive circumstances" without good cause, even if the alleged "change" was contractually permitted. * * *

* * * *

> * * * [T]o interpret the subdivision as does Defendant, would produce consequences contrary to the obvious motive of a statute which affords protection to dealers and distributors. For example, Defendant could appoint many new dealers and thus create market conditions – without actually terminating Plaintiff – that would render the dealer's business entirely unprofitable. If this Court accepts Defendant's interpretation of the provision in question, [Minnesota's HUEMDA] would actually provide no remedy for substantial changes above and beyond what a dealer would normally have were it to raise a contract claim. The statute requires good cause and notice for termination so that, for example, the superior bargaining position of man-

ufacturers cannot be used to enforce terminable-at-will provisions in dealership agreements. The statute thus provides an extracontractual remedy for terminations by manufacturers, and it is consistent, therefore, to interpret the phrase "substantial change in competitive circumstances" to permit remedies for substantial competitive changes beyond what was agreed upon by the parties in writing.

We find the reasoning of the *Great Dane* court persuasive and, accordingly, conclude that Minn.Stat. § 325E.0681 applies to this case.

Good cause is not at issue in this case. The parties stipulated:

> For purposes of this lawsuit, Navistar does not claim that Astleford has failed substantially to comply with the essential and reasonable requirements imposed by Astleford's dealership agreement with Navistar, requirements which are not different from those imposed on other similarly situated dealers.

Thus, the only question is whether the district court erred in concluding that Navistar's approval of the Eagan facility would not substantially change the competitive circumstances of Astleford's dealership agreement with Navistar.

■ The parties dispute how significant a change must be to "substantially change the competitive circumstances" within the meaning of Minn.Stat. § 325E.0681, subd. 1. The seventh circuit court of appeals interpreted the term "substantial change in competitive circumstances" in Wisconsin's Fair Dealership Law as meaning a "de facto or constructive termination of the dealership agreement." *East Bay Running Store, Inc. v. NIKE, Inc.*, 890 F.2d 996, 998, 1000–01 (7th Cir.1989) (athletic apparel supplier's nondiscriminatory, system-wide new policy prohibiting specified sales by mail or telephone did not constitute "substantial change in competitive circumstances of dealership agreement" even though it had the potential to hurt dealers' profitability); *see also Jungbluth v. Home-*

*town, Inc.*, 201 Wis.2d 320, 548 N.W.2d 519, 524 (1996) (notice requirement in Wis. Stat. § 135.04 "designed to afford the dealership the opportunity to react and protect itself from the potentially devastating affects [sic] of an overreaching grantor"); *Van Riper v. Ford New Holland, Inc.*, 261 Mont. 206, 862 P.2d 47, 51 (Mont.1993) (upholding finding of "substantial change in competitive circumstances" when manufacturer indirectly terminated dealership; manufacturer's conduct included unilaterally placing dealer in attrition status without reasonable notice or the opportunity to avoid further investment, establishing a second dealership in the area knowing two dealers could not survive, refusing to remove dealer from stop ship status after receiving payment, and diverting dealer's orders for goods without notice and transferring such products to competitor). This interpretation is consistent with the statutory construction rule that general words are construed to be restricted in their meaning by preceding particular words. Minn.Stat. § 645.08(3) (1998). The words preceding "substantially change the competitive circumstances" in Minn.Stat. § 325E.0681, subd. 1, are "terminate, cancel, fail to renew," all of which have the same meaning. We conclude that the term "substantially change the competitive circumstances" in Minn.Stat. § 325E.0681, subd. 1, means conduct amounting to a de facto or constructive termination of a dealership agreement.

■ Whether a "substantial change in the competitive circumstances" has occurred is a fact question. *See Meyer v. Kero–Sun, Inc.*, 570 F.Supp. 402, 404 (W.D.Wis.1983) (whether change in the exclusivity of a distributorship arrangement constituted a substantial change in competitive circumstances was a factual dispute). This court will not reverse the district court's findings of fact unless clearly erroneous. Minn. R. Civ. P. 52.01.

■ Astleford's expert, Ernest Manuel, testified that the truck industry was expe-

riencing a profitable period, and he did not believe NSF would drive Astleford out of business in that economic climate. Astleford does not challenge the district court's finding that it would be more likely than NSF to survive the next industry downturn. The district court's finding that approval of NSF's new dealership in Eagan would not constitute a substantial change in circumstances is not clearly erroneous.

## II.

Minn.Stat. § 80E.14, subd. 1 (1998), provides:

> In the event that a manufacturer seeks to enter into a franchise establishing an additional new motor vehicle dealership or relocating an existing new motor vehicle dealership within or into a relevant market area [RMA] where the line make is then represented, the manufacturer shall, in writing, first notify each new motor vehicle dealer in this line make in the relevant market area of the intention to establish an additional dealership or to relocate an existing dealership within or into that market area. The relevant market area is a radius of ten miles around an existing dealership. * * * Thereafter the manufacturer shall not establish or relocate the proposed new motor vehicle dealership unless the court has determined that there is good cause for permitting the establishment or relocation of the motor vehicle dealership.

Minn.Stat. § 80E.14, subd. 2 (1998), lists nine factors for the court to consider "[i]n determining whether good cause has been established for entering into or relocating an additional franchise for the same line make." The statutory

> factors focus on the interests of three separate groups or entities: (1) the consuming public; (2) the protesting dealer; and (3) all new car dealers within the protestant's RMA.

*T.I.W., Inc. v. American Honda Motor Co., Inc.,* 808 F.Supp. 1399, 1401 (D.Minn. 1992); *see also* Minn.Stat. § 80E.01 (1998)

(purpose for motor vehicle sale and distribution act (MVSDA) is to promote public interest and protect investments and properties of Minnesota citizens).

Navistar argues that the district court erred in applying Minn.Stat. § 80E.14 to this case because the statute only applies when a manufacturer seeks to establish a new dealership in an RMA where the line make is already represented. Navistar argues that the term "make" should be construed as referring to the manufacturer and "line" should be construed as a specific type of vehicle made by a manufacturer. In other words, in this case, International is the "make" of the truck, and heavy-duty and medium-duty trucks are two different lines of International trucks. We need not decide whether the definition of line make urged by Navistar is the statutory definition. Although Astleford is authorized to sell only new medium-duty International trucks and NSF will be authorized to sell only new heavy-duty International trucks, the record shows that there is an overlap between the trucks International designates as medium duty and those it designates as heavy duty. Therefore, even under the definition proposed by Navistar, both Astleford and NSF will be selling the same line make of new International trucks.

■ Navistar also argues that Minn. Stat. § 80E.14 does not apply to this case because the statute applies only to new motor vehicle dealers, and Astleford only claims that NSF will impact its parts and service business, not its new truck sales business. We disagree. Minn.Stat. § 80E.03, subd. 3, defines a "dealer" as "a person who in the ordinary course of business is engaged in the business of selling new motor vehicles." Neither Minn.Stat. § 80E.03, subd. 3, nor Minn.Stat. § 80E.14 distinguish between new motor vehicle sales and other aspects of a dealer's business. The evidence supports the district court's finding that "after-sale parts and service is a very important element of a

dealer's business." It would be inconsistent with the statutory purpose of protecting a dealer's investment to separate new truck sales from the parts and service business for purposes of analysis under Minn.Stat. § 80E.14. The district court properly concluded that Minn.Stat. § 80E.14 applies to this case.

We next consider the district court's analysis of the "good cause" factors in Minn.Stat. § 80E.14, subd. 2.

*Investment of existing and proposed dealerships – Minn.Stat. § 80E.14, subd. 2(a)*

Astleford argues that the district court erred in finding that NSF made an extensive commitment to its dealership because the evidence did not show that the investment was made for purposes of an International dealership. The statutory language does not support Astleford's argument. Unlike other subsections of Minn.Stat. § 80E.14, subd. 2, subsection (a) does not refer to a specific line make.

*Effect of new dealership on existing dealerships and public welfare – Minn. Stat. § 80E.14, subd. 2(c)*

Astleford argues that Navistar failed to demonstrate that NSF would not significantly injure Astleford. However, a finding of good cause under Minn.Stat. § 80E.14 does not depend solely on NSF's effect on Astleford, but rather requires a balancing of the interests of consumers, Astleford, and other new truck dealers within Astleford's RMA. See *T.I.W.*, 808 F.Supp. at 1401 (discussing statutory factors). The district court made detailed findings on the impact NSF will have on Astleford, and the evidence supports those findings.

*Adequate market penetration—Minn. Stat. § 80E.14, subd. 2(e)*

Astleford argues that the district court erred in considering NSI's performance as an International heavy-duty truck dealer because NSI is outside the RMA. Even if the district court should only have consid-

ered Astleford's performance and even if Astleford's performance as a medium-duty truck dealer is exemplary, evidence supports the district court's finding that Navistar's share of the heavy-duty truck market in the RMA is about 50% less than its national average. Astleford cites no authority to support its argument that if Navistar wanted to establish an International heavy-duty truck dealership within the RMA, Navistar was required to reauthorize Astleford as an International heavy-duty truck dealer.

*Increased competition benefiting the public interest – Minn.Stat. § 80E.14, subd. 2(f)*

Astleford argues that the district court erred in finding that NSF would benefit the public interest by increasing interbrand competition among heavy-duty truck dealers. Several competitors of Navistar for heavy-duty truck customers operate dealerships within ten miles of NSF, including Chesley Freightliners, Lakeland Ford Truck Sales, Inc., and Allstate Peterbilt. In light of the evidence of the increasing truck market in the RMA and surrounding areas, the district court's finding that the increased competition would benefit the public interest is not clearly erroneous.

Astleford does not object to the district court's findings on the remaining statutory factors. Astleford cites no authority supporting its argument that the district court erred in failing to consider alternative locations outside of Astleford's RMA where NSI could establish a secondary facility. The evidence is sufficient to support the district court's determination of good cause. See *Wilkins Dodge, Inc. v. Chrysler Corp.*, 426 N.W.2d 903 (Minn.App.1988) (upholding determination of good cause under Minn.Stat. § 80E.14), *review denied* (Minn. Sept. 16, 1988).

### III.

The decision whether to grant a new trial lies within the district court's

discretion and will not be reversed absent a clear abuse of discretion. *Baker v. Amtrak National R.R. Passenger Corp.*, 588 N.W.2d 749, 753 (Minn.App.1999). The district court has broad discretion to grant or deny discovery requests, and its decision will not be reversed absent an abuse of discretion. *Berge v. Commissioner of Pub. Safety*, 588 N.W.2d 177, 179 (Minn. App.1999).

■■■ Astleford sought discovery regarding a secondary facility that NSI operated in Hudson, Wisconsin from 1992 through 1994. Astleford argues that evidence regarding the Hudson operation would have helped the district court evaluate NSI's effectiveness as a new heavy-duty truck dealer and the likelihood that NSF would generate parts and service business for Astleford. But Astleford had the opportunity to question Gleeson about the Hudson facility during his two-day deposition, and Astleford cites no evidence that market conditions in Hudson were similar to market conditions in Astleford's and NSI's AORs. The district court's failure to compel NSI to provide discovery on its Hudson operation was not an abuse of discretion.

■■■ Astleford also contends that it should have been allowed to conduct discovery on the location of NSI's new truck, parts, and service customers and the volume of parts and service business those customers generate. But Astleford was provided with the identity and purchase history of customers to whom NSI sold International trucks during the preceding three years and also had the opportunity to question Gleeson and Don Williams, NSI's vice president, during their depositions about NSI's parts and service customers. The district court's findings that NSF would not significantly affect Astleford appear to be based on evidence that (1) Astleford and NSI both have a backlog of repair work; (2) Astleford's repair facility is larger and better-equipped than NSF's; (3) the growing truck market in the Twin City area; and (4) more than 80% of truck parts are interchangeable, and Astleford already faces so much competition in the parts and service business that the addition of NSF would not have a substantial impact on Astleford. The party seeking a new trial must demonstrate that the district court erred and that the error was prejudicial. *Midway Ctr. Assocs. v. Midway Ctr., Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (Minn.1975). Even if the district court erred in not allowing Astleford to conduct discovery on the location of NSI's new truck, parts, and service customers and the amount of service business they generate, Astleford has not demonstrated that any error was prejudicial.

### IV.

■■■ Astleford contends that the trial court improperly considered a market penetration analysis that was not prepared by Navistar until after trial. The market penetration analysis to which Astleford objects showed Navistar's 1996 and 1997 market share of class 8 trucks in zip code areas entirely or partially within the ten-mile RMA around Astleford. The analysis was included in Navistar's posttrial brief and was based on exhibit 104, a 252–page report showing registration data for trucks of all makes registered in zip code areas in NSI's AOR. Wayne Krzysiak, vice president and general manager of Navistar's parts operations, laid the foundation for exhibit 104 and explained how the document can be used to determine a dealer's market share.

■■■ Astleford argues that it did not have the opportunity to respond to the analysis. But Astleford had the opportunity to cross-examine Krzysiak on exhibit 104 and could have responded to the market penetration analysis in a posttrial brief or in its motion for a new trial. Astleford also contends that the analysis was improper because exhibit 104 was not entirely accurate in showing market share. This objection goes to the weight of the evidence, not its admissibility. *See Hughes v.*

*Sinclair Mktg., Inc.,* 389 N.W.2d 194, 199 (Minn.1986) (alleged errors in calculating future lost profits go to the weight of evidence not admissibility). The district court did not err by considering the market penetration analysis.

## DECISION

The district court properly concluded that Minn.Stat. § 325E.0681, subd. 1, applies to this case, and its finding that NSF will not substantially change the competitive circumstances of Astleford's dealership agreement with Navistar is not clearly erroneous. The district court properly concluded that Minn.Stat. § 80E.14 applies to this case, and the evidence supports the district court's determination that Navistar demonstrated good cause for establishing an additional new heavy-duty truck dealership in Astleford's RMA. The district court did not err by denying Astleford's motion for a new trial or by considering the market penetration analysis submitted with Navistar's posttrial brief.

**Affirmed.**