ASTLEFORD EQUIPMENT CO., INC., Petitioner, Appellant,

v.

NAVISTAR INTERNATIONAL TRANS-PORTATION CORP., a Delaware corporation, Respondent.

No. C5–99–1612.

Supreme Court of Minnesota.

July 19, 2001.

Robert L. DeMay, David M. Jaffe, Minneapolis, for appellant.

Thomas W. Pahl, Ezra D. Rosenberg, Princeton, NJ, for respondent.

J. Michael Dady, Minneapolis, for amicus curiae Farm Equipment Ass'n of MN and SD, and Equipment Distributors Ass'n of MN.

## OPINION

PAUL H. ANDERSON, Justice.

Astleford Equipment Co., an International truck dealership, brought an action in Hennepin County District Court against Navistar International Transportation Corp., the manufacturer of International trucks. Astleford alleged that Navistar violated Minnesota's Heavy and Utility Equipment Manufacturers and Dealers Act (HUEMDA) when it approved another International truck dealership within 10 miles of Astleford's Burnsville, Minnesota dealership. HUEMDA provides in rele-

vant part that no equipment manufacturer "may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause." Minn.Stat. § 325E.0681, subd. 1. Astleford alleged that Navistar violated the statute by substantially changing the competitive circumstances of its dealership agreement when it approved the other dealership as an International truck dealership. The district court found in favor of Navistar and the court of appeals affirmed. We affirm in part, reverse in part, and remand to the district court.

Astleford was established in 1945 as a dealer of farm implements manufactured by International Harvester Corporation. It was located in Richfield until 1985 when it moved to its current location in Burnsville. Since the 1960s, Astleford has been a dealer of the International brand of commercial trucks. Navistar is the successor in interest to the truck division of International Harvester Corporation. Astleford currently sells new medium-duty International trucks, Isuzu trucks, used trucks, and it sells parts and provides service for all types of trucks.

At one time, there were a number of International truck dealerships in the Minneapolis/St. Paul metropolitan area. However, after a significant downturn in the commercial truck industry, several International truck dealerships went out of business. Astleford's Burnsville dealership and Navistar's company-owned dealership in Minneapolis were two of the only three International dealerships to survive in this area. Astleford's survival was due in large part to its ability to maintain profitability in its parts and service sales. In 1982, Navistar sold its Minneapolis dealership to North Star International Trucks, Inc. (North Star International), which is owned and operated by Michael Gleeson, a former Navistar regional manager of dealer operations. Since 1982, Astleford and North Star International have been intrabrand competitors.

In 1988, Navistar attempted to terminate Astleford's dealership contract. At the time, Astleford was authorized to sell parts and do warranty service for all International trucks, and it was authorized to sell both heavy-duty and medium-duty International trucks. The dealership contract also assigned Astleford an area of responsibility in which Astleford was expected to maintain a certain level of sales, but there was no agreement as to exclusivity within or without the area of responsibility. In response to Navistar's efforts to terminate the dealership contract, Astleford sued Navistar for breach of contract. The 1988 case settled in 1990. As part of the settlement agreement, Astleford's dealership contract was revised, and Astleford gave up its right to sell heavy-duty International trucks. Following the contract revision, the only International trucks Astleford was authorized to sell were medium-duty trucks. However, Astleford could still service heavy-duty trucks, and this type of service made up approximately 40% of its service business.

Beginning in 1996, Gleeson attempted to acquire Astleford. When those efforts failed, Gleeson acquired a truck repair and rental facility in Eagan, which was within 10 miles of Astleford. Gleeson then established North Star Fleet at this location and applied to Navistar for approval of North Star Fleet as an International truck dealership. Because North Star Fleet is located within 10 miles of Astleford and would be in direct competition with Astleford, Navistar was concerned about violating Minn.Stat. § 80E.14 (2000) of the Motor Vehicle Sale and Distribution Act (MVSDA). The MVSDA provides in relevant part that if a manufacturer intends to

introduce a new motor vehicle dealership into a relevant market area (defined as 10 miles) where the "line make" is already represented, the manufacturer must provide notice, and if the location of the proposed dealership is challenged by the existing dealership, there must be a judicial determination of good cause for establishing the new dealership. Minn.Stat. § 80E.14. As a result, Navistar intended to approve North Star Fleet only as a heavy-duty International truck dealership. Shortly thereafter, Navistar notified Astleford of its intention to approve the nearby North Star Fleet dealership.

After receiving the notice, Astleford brought an action against Navistar in Hennepin County District Court for violating the MVSDA and HUEMDA and for breach of an implied covenant of good faith and fair dealing. Upon commencement of this action, Navistar suspended approval of its dealership contract with North Star Fleet pending resolution of the action. Before trial, the court dismissed Astleford's claim regarding breach of an implied covenant of good faith. The parties stipulated that good cause under HUEMDA was not an issue in the case. The MVSDA and HUEMDA claims were then tried before the court without a jury.

At trial, an expert witness for Astleford presented an extensive analysis of the detrimental financial effect another International dealership located in such close proximity could have on Astleford. The expert testified that proximity is a significant factor in determining where a customer takes repair work. He then defined a dealership's relevant market area to be the 12–mile radius around that dealership because 12 miles is the distance that truck owners are generally willing to travel for repair work. The expert then testified that the total geographic area covered by Gleeson's two dealerships increases by only 15% with the addition of North Star Fleet. At the same time, the area in which North Star and North Star Fleet's relevant market areas overlap with Astleford's relevant market area more than doubles with the addition of North Star Fleet.

Sandra Dawson, Astleford's owner and president, testified that her main concern regarding the new dealership was that much of Astleford's parts and service business would be lost if the new dealership were permitted. Dawson claimed that parts and service accounted for the largest portion of Astleford's profits. To support this claim, Astleford's expert presented evidence that in 1996 and 1997, 95.7% of Astleford's net profits were from the parts, service, and paint and body shop departments. Dawson also asserted that Astleford could maintain a competitive advantage over a new dealership such as North Star Fleet only because it provides parts and service that are covered by an International warranty. Astleford's expert testified that during the 6 months before trial, approximately 93% of Astleford's gross profits from parts and service was from "International related" business. However, there was not any evidence of the portion of that work that was actual International warranty work.

Astleford's expert testified that during the 6 months before trial, 38.3% of Astleford's gross profits from all parts and service business came from customers in a geographic area closer to North Star Fleet than Astleford. The expert concluded that 38.3% was the portion of Astleford's business that, with North Star Fleet in place, would be in a geographical area where North Star Fleet, from a pure proximity standpoint, would have a competitive advantage. He determined if 38.3% of Astleford's gross profits were lost due to North

Star Fleet's competition, Astleford would lose 52.4% of its net profits.

Navistar responded to the expert's testimony by arguing that the expert's definition of "International related" business included both warranty and nonwarranty work. Navistar argued that any dealership could compete with Astleford for nonwarranty work. It also claimed that the expert included in his computations all the warranty and nonwarranty work done for Astleford customers with more than one vehicle, even though some of the vehicles worked on for these customers were not International trucks. It went on to assert that this distinction was critical because Astleford's contract with Navistar did not provide Astleford with any competitive advantage for work done on trucks that were not International trucks. Navistar also pointed out that 80% of truck parts are all-make parts, meaning that they are interchangeable among manufacturers.[1] It asserted that any dealership could provide all-make parts for International trucks without Navistar's approval. Navistar argued that if the court looked only at warranted parts and service and were to factor in that 80% of parts are all-make parts, the percentage of Astleford's profits threatened by approval of North Star Fleet as an International dealership would be much smaller than estimated by Astleford's expert.

Navistar also argued that non-International service centers could sell International parts that carry the International warranty, and that only the service provided by such centers would not be warranted because it was not done at an authorized International dealership. Therefore, Navistar argued, a customer could take nonwarranty work to any mechanic without

suffering any disadvantage. Navistar claimed that other service centers could offer warranties similar to International's warranty on service.

Astleford responded to this claim by asserting that the advantage of using International parts and service is that the large nationwide chain of International dealerships offers replacement service on warranted parts. Navistar has the largest dealership network in the country, which network serves the parts and service needs of International truck customers. This network provides Navistar and its dealers with an advantage over their competitors. Astleford also asserted that the ability of a dealer to guarantee free replacement service at any International dealership gives the dealer a substantial advantage in competing for all-make parts replacement and nonwarranty service business.

Navistar next argued that the proposed North Star Fleet dealership would not have any effect on Astleford's body shop work because North Star Fleet does not have a body shop. Navistar also asserted that North Star Fleet was in operation for the 15–month period before trial, offering all services except warranty service, and Astleford had not offered any evidence of financial harm actually suffered by Astleford during this period. Finally, Navistar argued that Astleford's expert admitted that if more trucks were sold, it would provide an increased source of warranty service business.

Another International dealer testified on behalf of Navistar. This dealer, a former Navistar employee who operates an International dealership in another state, testified that North Star Fleet would not have

---

1. Another International dealer testifying on behalf of Navistar explained that it is mostly cab parts and the engine block that are not all-make parts. Most engine component parts, which are usually what require service, are all-make parts.

a large impact on Astleford's profits because there are so many parts and service competitors in the area surrounding Astleford. He stated that one more competitor would not make a large difference. This witness testified that Astleford had loyal customers who would not change dealerships and that Astleford would lose only 20–25% of the 40% of the customers who were in a geographic area that was closer to North Star Fleet than to Astleford. The witness also testified that because of a mechanic shortage, Astleford would maintain its maximum capacity for service business. He claimed that North Star Fleet would have so much business coming from customers located in a geographic area in close proximity to it that it would not have the capacity to take much business away from Astleford.

After hearing all the evidence, the district court issued 143 findings of fact and, based on these findings, concluded that Astleford failed to establish that approval of North Star Fleet as an International dealership would substantially change the competitive circumstances of Astleford's dealership contract with Navistar. Among other things, the court found that: the North Star dealership would stimulate heavy-duty International truck sales; any increase in sales of heavy-duty trucks would result in new parts and services income for Astleford; Astleford would lose its competitive advantage in the relevant market area if North Star was approved as an International heavy truck dealer; Astleford already faces so much competition in the parts and services markets that the addition of one more competitor would have no substantial impact on Astleford; 80% of truck parts were interchangeable; in good economic times, North Star Fleet would not significantly affect the stability of Astleford's dealership; in future economic downturns, Astleford is far more likely to survive than North Star Fleet;

and the approval of North Star Fleet "will only result in a minimal change in the competitive circumstances of Astleford, not a substantial chnge (sic)." Based on these findings, the court ruled in favor of Navistar and denied all relief under the MVSDA and HUEMDA.

Astleford appealed to the court of appeals on the grounds that the district court incorrectly applied the relevant sections of the MVSDA and HUEMDA, that the district court erred in failing to require Navistar to comply with certain discovery requests, and that Astleford was entitled to a new trial because the district court considered a market penetration analysis that Navistar had not prepared until after trial. Astleford argued, among other things, that the district court misinterpreted or misapplied HUEMDA's prohibition against substantially changing the competitive circumstances of a dealership agreement without good cause.

The court of appeals concluded it did not have grounds to reverse the district court's findings of fact because the findings were not clearly erroneous. *Astleford Equip. Co. v. Navistar Int'l,* 611 N.W.2d 33, 40 (Minn.App.2000). It affirmed the court's conclusion that approval of North Star Fleet as an International dealership would not amount to a substantial change in the competitive circumstances. *Id.* The court of appeals also concluded that the phrase "substantially change the competitive circumstances" means "conduct amounting to a de facto or constructive termination of a dealership agreement." *Id.* at 39. Finally, the court of appeals rejected Astleford's arguments regarding the MVSDA, the denial of discovery requests, and the market penetration analysis that was presented to the district court after trial. *Id.* at 41–42.

Astleford then appealed to our court, again asserting that the district court did

not properly apply section 325E.0681 of HUEMDA or section 80E.14 of the MVSDA and that the case should be reversed and remanded for a new trial, or remanded for further consideration under the correct standard. Astleford requests that we hold that a finding of de facto or constructive termination is not required to find a violation of section 325E.0681. We granted review, but limited our review to issues raised under HUEMDA.

## I.

■■■ This case presents an issue of statutory interpretation, more specifically, the interpretation of Minn.Stat. § 325E.0681, subd. 1, and the meaning of the phrase "substantially change the competitive circumstances of a dealership agreement * * *." Statutory interpretation is an issue of law that we review de novo. *Baker v. State,* 590 N.W.2d 636, 638 (Minn.1999). Basic rules of statutory construction instruct that words and phrases are to be construed according to their plain and ordinary meaning. *Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn.1980). A statute should be interpreted, whenever possible, to give effect to all of its provisions, and "no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Amaral v. Saint Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn.1999). Various provisions of the same statute must be interpreted in light of each other. *Van Asperen v. Darling Olds, Inc.,* 254 Minn. 62, 74, 93 N.W.2d 690, 698 (1958). Finally, courts should construe a statute to avoid absurd and unjust consequences. *See Erickson v. Sunset Mem'l Park Ass'n,* 259 Minn. 532, 543, 108 N.W.2d 434, 441 (1961).

The first question we must answer is whether, under Minn.Stat. § 325E.0681, subd. 1, Navistar's approval of North Star Fleet as a heavy-duty International truck dealership substantially changes the competitive circumstances of Navistar's dealership agreement with Astleford. Our analysis of this first issue focuses on the meaning of the word "substantially." The court of appeals concluded that for a change in competitive circumstances to be viewed as substantial, it must amount to de facto or constructive termination.

In reaching its conclusion, the court of appeals relied on a Seventh Circuit decision, *East Bay Running Store, Inc. v. Nike, Inc.,* 890 F.2d 996 (7th Cir.1989). *East Bay* involved the Wisconsin Fair Dealership Law (WFDL), Wis. Stat. ch. 135 (1999), which contains a clause with the same language as Minn.Stat. § 325E.0681. The WFDL states "No grantor * * * may terminate, cancel, fail to renew or *substantially change the competitive circumstances of a dealership agreement without good cause.*" Wis. Stat. § 135.03 (1999).[2] (Emphasis added.) In *East Bay,* the Seventh Circuit held that the WFDL did not apply to a nondiscriminatory, system-wide policy adopted by the manufacturer that prohibited the mail ordering of a line of shoes. *East Bay,* 890 F.2d at 1001. After it made this holding, the court went on to state that there was no substantial change in the competitive circumstances amounting to a de facto or constructive termination of the dealership agreement. *Id.* The Minnesota Court of Appeals extrapolated from this statement a holding by the Seventh Circuit that in order for a change to amount to a substantial change in the competitive circumstances, it must be a change that amounts

---

**2.** Although Wis. Stat. § 135.03 contains identical language, the WFDL states specifically that its provisions do not apply to motor vehi-

cle dealerships. Wis. Stat. § 135.07(1) (1999).

to de facto or constructive termination. *Astleford*, 611 N.W.2d at 39. However, this was not the holding in *East Bay*.

In a footnote in *East Bay*, the Seventh Circuit cited an earlier Seventh Circuit opinion for the proposition that the WFDL provision regarding substantially changing the competitive circumstances of a dealership agreement "may be meant to protect the dealer against 'constructive termination.'" *East Bay*, 890 F.2d at 1000, n. 6 (citing *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240 (7th Cir.1986)). Although the Seventh Circuit did contemplate a constructive termination standard in *Remus*, Judge Posner, writing for the court, also stated that the statute "may go somewhat further * * * and protect dealers against new competition that has substantially adverse although not lethal effects." *Remus*, 794 F.2d at 1241. This ambiguity in *Remus* weakens the effect of the Seventh Circuit's footnote and comment in *East Bay* regarding a constructive termination standard because *East Bay* relied on only part of *Remus*. In fact, it appears that the second statement in *Remus* regarding a change being substantially adverse although not lethal is more consistent with our interpretation of HUEMDA. Further, while a de facto or constructive termination standard may be attractive because it provides a bright-line rule, we conclude that such a standard is too narrow.

Section 325E.0681, subd. 1, requires good cause in order for a manufacturer to "terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement * * *." As stated earlier, when interpreting a statute, "no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Amaral*, 598 N.W.2d at 384. If *substantially change the competitive circumstances of the dealership agreement* is interpreted as meaning de facto termination, the substantial change provision would be rendered superfluous. A plain reading of the word "terminate" would include de facto termination. "De facto" is defined as "actual" or "existing in fact," so de facto termination would be actual termination. *See* Black's Law Dictionary 427 (7th ed.1999). In order to give the phrase *substantially change the competitive circumstances of the dealership agreement* any meaning, the phrase must be construed to mean something other than de facto termination. Therefore, we reject the court of appeals' interpretation of *East Bay* and its conclusion that a change in the dealership agreement must amount to de facto or constructive termination before it can be found to violate the provisions of HUEMDA.

At the opposite end of the spectrum from a de facto termination standard is Astleford's argument that a substantial change should be defined as any change that is nontrivial. In support of its position, Astleford cites several cases that state that substantial is something more than *de minimus*. In response, Navistar contends that in the context of competitive circumstances, a change that is more than trivial does not necessarily reach the level of substantial. We reject Astleford's suggestion that any change in the competitive circumstances of the dealership agreement that is more than trivial amounts to a substantial change. We conclude that such a standard is too broad. In the context of dealerships under the statute, it is safe to assume that some change in competition is permitted even when it is more than trivial. The legislature's tolerance for some competition is evidenced by the fact that substantial change follows the terms cancel, terminate and fail to renew, all of which are harsh consequences that go way beyond more than trivial.

Because we conclude that a de facto termination standard is too narrow and a "more than trivial" standard is too broad, the standard for a substantial change in the competitive circumstances of the dealership agreement must be somewhere in between. We have not addressed this issue before; therefore, to help with our analysis, we look to a Wisconsin Supreme Court decision interpreting a similar provision-the WFDL-and a Minnesota federal district court decision applying Minnesota's HUEMDA.

Seven years after the Seventh Circuit's decision in *East Bay,* the Wisconsin Supreme Court decided *Jungbluth v. Hometown, Inc.,* 201 Wis.2d 320, 548 N.W.2d 519 (1996). Jungbluth operated a service station, owned by Hometown, under a dealership agreement. Jungbluth sued Hometown for violating the WFDL notice provision. The court was asked to determine whether Hometown's conduct "substantially changed the competitive circumstances of Jungbluth's dealership so as to require notice pursuant to Wis. Stat. § 135.04." *Jungbluth,* 548 N.W.2d at 520. Jungbluth's service station was under construction for 7 months while Hometown replaced the fuel storage tanks. *Id.* at 521. Hometown also decided to remodel Jungbluth's service station without giving Jungbluth notice. *Id.* Jungbluth argued that the construction was so substantial that it impaired his ability to do business, thereby substantially changing the competitive circumstances of the dealership agreement. *Id.*

The Wisconsin Supreme Court first addressed the intent and purpose of the WFDL. *Id.* The court concluded that the explicit purpose of the WFDL is to "protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships."

*Id.* at 522 (emphasis omitted) (quoting Wis. Stat. § 135.025(2)(b)). The court also stated that the WFDL's notice provision, Wis. Stat. § 135.04, "is designed to afford the dealership the opportunity to react and protect itself from the potentially devastating affects [sic] of an overreaching grantor, who * * * changes the competitive circumstances, not of the dealership agreement, but rather the business itself." *Jungbluth,* 548 N.W.2d at 524.

After reviewing the intent and purpose of the WFDL, the Wisconsin court concluded that Hometown's renovation substantially changed the competitive circumstances of the dealership, entitling Jungbluth to damages because Hometown did not give him 90 days notice as required by section 135.04. *Jungbluth,* 548 N.W.2d at 525. The court did not address the de facto termination standard set forth in *East Bay.* Nor did the court state a specific standard. Rather, it limited its analysis to an interpretation of the notice and cure provisions of the WFDL and then based its decision on the facts of the case. Nevertheless, some of the court's statements give us an insight as to the standard it used when it reached the conclusion that Hometown's construction projects substantially changed the competitive circumstances of the dealership agreement.

The Wisconsin court stated that the nature of the changes in Jungbluth's competitive circumstances inhibited his ability to operate his dealership on a daily basis. *Jungbluth,* 548 N.W.2d at 525. The court also concluded that, due to extensive construction, Jungbluth was not able to develop his clientele or reputation, nor was he successful in his attempts to realize a profit from the sale of gasoline, convenience-store goods, or auto repair. *Id.* Additionally, the court concluded that Jungbluth's competitive position compared to neighbor-

ing service stations was greatly diminished because he was not able to fully service the limited number of customers he was able to attract. *Id.*

The Minnesota Federal District Court, citing *Jungbluth*'s determination as to the intent and purpose of the WFDL, has concluded that the Minnesota legislature enacted HUEMDA with the same basic intent-to protect the dealer, who has significantly less bargaining power than the grantor. *See Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. P'ship*, 977 F.Supp. 1386, 1394 (D.Minn.1997) (*Great Dane*). In *Great Dane*, the federal district court was determining whether a grantor's action can be found to violate HUEMDA if such action is not prohibited by the four corners of the dealership agreement. The court concluded

> that legislation implemented to protect dealers must protect more than the provisions of the written agreement. "Judicial protection of the terms of a dealership agreement, though meaningful in many other respects, should not come at the expense of the dealer, a party whom the legislature has sought to empower with an equalized bargaining position relative to that of the grantor."

*Id.* (quoting *Jungbluth*, 548 N.W.2d at 524–25).

■ We agree with the federal district court in *Great Dane* that the purpose of HUEMDA is to protect the dealer, who is often in a weaker bargaining position than the grantor who inherently has superior economic power in the negotiation of dealerships. We also conclude, as did the Wisconsin Supreme Court when it construed the WFDL in *Jungbluth*, that in applying HUEMDA, the ultimate conclusion as to whether there was a violation of the statute must be based on the specific facts of the case presented. Therefore, when applying section 325E.0681, subd. 1,

of HUEMDA, a court should engage in a case-by-case factual inquiry in reaching its ultimate conclusion of whether there has been a substantial change in the competitive circumstances. However, the key question that remains is what legal standard should the court use when making this inquiry.

■ A reading of the plain language of the statute indicates that the statute allows some change in competition. Thus, the statute cannot be read to protect a dealer from nearly all new competition that threatens the dealer's profits. On the other hand, while the express language of the statute encompasses a de facto or constructive termination situation, as stated earlier, we conclude that this standard is too narrow. Such a standard does not protect·a dealer who somehow manages to stay in business, but whose day-to-day viability is severely diminished by the change in competition. The intent and.purpose of the statute is to protect against grantors or manufacturers attempting to create this type of new competition without good cause. Thus, the applicable standard lies somewhere in between these two extremes. Accordingly, we conclude that a substantial change in competitive circumstances is a change that has a substantially adverse although not necessarily lethal effect on the dealership. It is a change that is material to the continued existence of the dealership, one that significantly diminishes its viability, its ability to maintain a reasonable profit over the long term or to stay in business.

## II.

■ With this standard in mind, we next determine what standard was used by the district court in this case when it reached its conclusion. We must then determine whether the court applied the correct standard to the facts. If the court

applied the correct standard, we will then review the court's findings, which we will not set aside unless they are clearly erroneous. Minn. R. Civ. P. 52.01.

Based on the district court's findings of fact and conclusions of law and a review of the record, it is not clear what standard the court applied in concluding that there was not a substantial change in the competitive circumstances of Astleford's dealership agreement. Astleford argues that the district court must have applied a de facto termination standard to reach its conclusion that there was not a substantial change in the competitive circumstances of the dealership agreement. Astleford asserts that this must be so because certain findings are irreconcilable with the court's holding, unless the court was applying a de facto termination standard. Astleford points to the following eight findings of fact as being inconsistent with the court's conclusion.

56. The profitability of any truck dealership depends heavily on service and parts work as opposes (sic) to the sale of new or used trucks.

127. Approximately 95% of Astleford's new profits are derived from parts sales, service and repairs, including [work performed in] the body shop.

57. Astleford currently enjoys a competitive advantage in the RMA * * * by virtue of the investment it has made to be a franchised International dealership. * * * These franchise features give Astleford competitive advantages compared to other truck parts and service operations which (sic) are not International truck dealers in attracting parts and service business.

60. Astleford's competitive advantage * * * would be lost if North Star Fleet were appointed as an International heavy truck dealer.

61. [Proximity] is the primary factor in determining which dealership a customer will frequent for its parts and service business.

61. Navistar's own witnesses conceded that, over time, truck customers will tend to take their trucks to the nearest International truck dealership for parts replacement and other service.

66. Customers in ZIP code areas closer to the Eagan site than to Astleford account for 41.2% of Astleford's International-related parts and service gross profits.

66. While Astleford would not lose every International customer closer to the [Eagan] Site, Astleford would not retain every existing International customer closer to its own location, and some loss of business is likely to occur.

Astleford further asserts that, based on the above findings, the court must conclude that approval of North Star Fleet as an International dealership substantially changes the competitive circumstances of Astleford's dealership agreement.

Some of the district court's other findings, while being consistent with an ultimate conclusion that approval of the North Star Fleet dealership would not cause a substantial change in the competitive circumstances, create doubt as to whether the correct standard was used. For example, the court found that:

131. In good economic times, the Eagan dealership [North Star Fleet] will not significantly affect the stability of Astleford's dealership.

135. During previous business downturns, Astleford has survived when many other dealerships have failed. In future economic downturns the evidence establishes that Astleford is far more likely to survive than the Eagan facility [North Star Fleet].

These findings appear to be inconsistent with the eight findings cited by Astleford, making it difficult to determine the standard the district court was applying.

 We will not set aside a lower court's findings of fact unless they are clearly erroneous. *See* Minn. R. Civ. P. 52.01. Our review of the record indicates that with the exception of finding number 143, none of the district court's findings are clearly erroneous. Finding number 143 states that Navistar's approval of the North Star Fleet dealership "will only result in a minimal change in the competitive circumstances of Astleford * * *." It appears as though the court may have made this finding using a de facto termination standard whereby any action that did not reach the level of de facto termination was considered minimal. Further, when certain of the other findings made by the court are juxtaposed to the standard we have articulated today, they may be in conflict with each other and may not support the conclusion reached by the court.

When the district court's findings are reviewed in total, we conclude that it is not evident whether there was a substantial change in the competitive circumstances of the dealership agreement under the standard we have articulated. We also conclude that now that we have articulated the standard to be used when applying HUEMDA, the district court is in the best position to review the record and its findings and to reach a conclusion as to whether Navistar's approval of North Star Fleet as a heavy-duty International truck dealer substantially changed the competitive circumstances of Navistar's dealership agreement with Astleford. Therefore, we remand this case to the district court affirming all of the findings with the exception of finding number 143. On remand, we instruct the court to review its findings and conclusions under Minn.Stat.

§ 325E.0681 in light of the standard we have set forth above.

Affirmed in part, reversed in part, and remanded to the district court for proceedings consistent with this opinion.