## KEHNE ELECTRIC COMPANY, INC. v. STEENBERG CONSTRUCTION COMPANY.

177 N. W. (2d) 309.

May 15, 1970—No. 42110.

*Jardine, Logan & O'Brien,* for appellant.

*Dorsey, Marquart, Windhorst, West & Halladay, Curtis D. Forslund, Felhaber, Larson, Fenlon & Vogt,* and *Thomas W. Vogt,* for respondent.

Heard before Knutson, C. J., and Rogosheske, Sheran, Peterson, and Frank T. Gallagher, JJ.

PETERSON, JUSTICE.

Defendant, Steenberg Construction Company, and plaintiff, Kehne Electric Company, Inc., are prime contractor and subcontractor, respectively, upon a project of the Minneapolis-St. Paul Sanitary District situated in a low-lying area close to the Mississippi River in St. Paul, Minnesota. Plaintiff sustained flood damage to electrical work it had performed and sued defendant upon its subcontract to recover the amount of those damages.[1] Defendant appeals from an order denying its motion for a new trial and from the judgment in favor of plaintiff.

The basic issue is one of contractual interpretation: Whether

---

[1] The stipulated amount of flood damage was $32,968, the cost of reworking the electrical installation. Additional damages of $2,305 were sustained from lightning, but no separate issue is raised concerning this aspect of plaintiff's claim.

by contract the defendant prime contractor is responsible for loss to plaintiff subcontractor resulting from flooding of the project premises. There is no allegation that defendant is liable to plaintiff because of negligence. Interpretation and application of the contractual documents to this situation involve two inter-related questions: (1) Whether the plaintiff subcontractor had itself contractually assumed the defendant prime contractor's general responsibility for flood protection, a question the trial court answered in the negative; and (2) whether, if defendant retained responsibility for flood damage under its general contract with the project owner, it was liable to plaintiff subcontractor for such flood damage, a question the trial court answered in the affirmative. Because the contractual documents do not give unambiguous answer to these questions, the trial court appropriately received and considered evidence of prior conversations and contemporaneous conduct of the parties as an aid in interpretation of the documents and their application to the fact situation.

■ The general contract contains this express "special condition":

"1.21 POSSIBILITY OF FLOODING. This Contractor will be responsible for all damages due to flooding of the work during the life of this contract and until final acceptance of the work by the [Minneapolis-St. Paul] Sanitary District."[2]

---

[2] Similarly, the general contract, Part V, § 1.13, provides: "CONTRACTOR'S RESPONSIBILITIES.

\* \* \* \* \*

"Until the completion and final acceptance of all work under this Contract, the Contractor shall have the charge and care thereof and shall bear the risk of injury or damage to any part of the work by the action of the elements or from any other cause whether arising from the execution or nonexecution of the work.

"The Contractor shall rebuild, repair, restore and make good all injuries or damages to any portion of the work occasioned by any of the above causes before its completion and acceptance and shall bear the cost thereof."

The subcontract provides that the subcontractor agrees:

"XI.   To be bound to the Contractor by the terms of the General Contract * * * and to assume toward the Contractor all the obligations and responsibilities that the Contractor assumes in and by the General Contract toward the [Sanitary District], insofar as they are applicable to this Sub-Contract."[3]

Ambiguity is imported into the subcontractual assumption of general contractual obligations by the phrase "insofar as they are applicable to this Sub-Contract." We hold that the circumstances surrounding the contractual relationship, admissible in aid of interpretation where there is such ambiguity, support the trial court's finding that the parties did not intend plaintiff to assume defendant's responsibility for flood damage. Among such circumstances are these:

a.   The general contract stated specific measures which the prime contractor was to take in protecting the project from flood damage, such as preflooding and diking,[4] measures which could

---

[3] Similarly, the general contract, Part V, § 1.15, provides in part: "The Contractor agrees to bind every subcontractor by the terms of these Contract documents as far as is applicable to his work."

[4] The Special Conditions, Part VI, § 4.05, provides in part: "Adequate measures and protection shall be provided by the Contractor for tanks, galleries, vaults, basements, and the like to protect from damage from uplift due to ground water, storm water, or flood water. The permanent underdrain piping may be utilized for this purpose so far as may be practicable; however, the permanent pumps shall not be used except as otherwise specified. The Contractor shall make provisions to flood the tanks and any other structures which may be subject to uplift damage in event that the work is in danger of being flooded by any cause. Any damages which may result shall be the Contractor's responsibility."

Section 4.12 provides: "MAINTENANCE OF THE DIKE shall be the responsibility of the Contractor until the completed project is accepted by the Sanitary District. The dike shall be maintained to the line, grade and sections as shows on the drawings."

not practicably be undertaken by each of the several subcontractors. Defendant, in fact, did this work itself and without consulting plaintiff.

b.   The subcontract, which is a standard form prepared by the Associated General Contractors of Minnesota, contains a provision requiring the subcontractor to obtain and maintain various types of insurance "with limits in amounts at least equal to the greater of those specified in the General Contract or those specified [in the subcontract] ; and builders risk or installation floater * * * insurance, if required by the General Contract." Although the subcontract specified amounts for bodily injury and property damage liability, the space designated for "[b]uilders risk or installation floater (if required)" was left blank. During negotiations and prior to submission of plaintiff's bid for the subcontract, the president of defendant corporation told the president of plaintiff corporation that defendant would carry the builders risk insurance and that plaintiff need not do so.[5] Defendant did, in fact, take out insurance covering flood damage, and in the full amount of its general contract bid. The nature of the insurance required of plaintiff reflects an intention that it insure itself only with regard to risks inherent in performance of its own work.

c.   The subcontract contains explicit references to the subcontractor's liability for damage caused by forces within its con-

---

[5] A secondary issue raised by defendant is whether evidence of such conversation and conduct violated the parol evidence rule. It is well settled that, although evidence of preliminary negotiations is impermissible to contradict or vary the plain terms of a written contract, such evidence may be considered to explain contract language that is ambiguous or reasonably susceptible of more than one interpretation. See, Paul W. Abbott, Inc. v. Axel Newman Heating & Plumbing Co. Inc. 282 Minn. 493, 495, 166 N. W. (2d) 323, 325; Donnay v. Voulware, 275 Minn. 37, 144 N. W. (2d) 711; Lundstrom Const. Co. v. Dygert, 254 Minn. 224, 94 N. W. (2d) 527; Kane v. Oak Grove Co. 221 Minn. 500, 22 N. W. (2d) 588.

trol[6] but, unlike the general contract, it is conspicuously silent regarding responsibility for acts of God, warranting an inference that the prime contractor was to accept responsibility for such events.

■   Once it is determined that defendant retained exclusive responsibility for flood damage under its general contract with the Minneapolis-St. Paul Sanitary District, it follows from the terms of the subcontract that defendant is liable to plaintiff. It is not a question of whether the subcontractor is a beneficiary of the general contract but whether, under the subcontractual relationship itself, the prime contractor was to bear the risk of loss resulting from floods.

The critical finding of the trial court, interpreting the subcontract, is:

"That considering all of the provisions of the sub-contract agreement and the specifications, including the insurance provisions of the sub-contract and the specifications relating to flood damage, and the testimony of the parties, the sub-contract agreement between plaintiff and defendant means, and the parties so intended, that the risk of physical loss or damage sustained was to be borne by defendant; and that the parties intended that protection against such possible loss or damage would be by insurance coverage obtained by defendant."

We hold that this finding of fact is not without evidentiary support. To a considerable extent, it is the same evidence that re-

---

[6] For example, paragraph VI expressly limits the plaintiff's responsibility to loss or damage "occasioned by the failure of the Sub-Contractor to carry out the provisions of the Sub-Contract unless such failure results from causes beyond the control of the Sub-Contractor." So, also, paragraph VII specifies that plaintiff is responsibile for damages "arising out of, resulting from or in any manner connected with, the execution of the work provided for in this Sub-Contract * * *."

sulted in the finding that plaintiff had not assumed defendant's responsibility for flood damage.[7]

Plaintiff's basic obligation under its subcontract was to perform all electrical work on the project according to the architect's plans and specifications stated in the general contract. There is no indication in this record that all the work performed prior to the flood was not in full accord with those plans and specifications, and there is no claim that the damage to the electrical installation was the result of plaintiff's negligence or breach of contract. The controlling principle, as stated in Friederick v. County of Redwood, 153 Minn. 450, 190 N. W. 801, is that "where [a contractor] contracts to perform a given undertaking according to prescribed plans and specifications, he fulfills his engagement by doing the prescribed work in the [prescribed] manner, and is not responsible for defects, unless due to some fault on his part." Absent any contrary provisions in the subcontract, the risk of loss from flood was upon defendant. The repair and replacement of the electrical installation previously performed, therefore, was extra work for the reasonable value of which defendant was obligated to pay plaintiff.

Affirmed.

---

[7] In determining the parties' intent with respect to insurance coverage, a complicating factor is that plaintiff, as well as defendant, was insured for flood damage, although plaintiff was insufficiently insured. Plaintiff's insurance policy, however, had been previously in effect and was not undertaken either in anticipation of or compliance with any requirement of the subcontract. It does not appear that defendant was aware of such insurance at the outset; and when flood damage became imminent, defendant's president reassured plaintiff's president that defendant was fully insured for "all" the flood damage. It is not the fact of existing insurance which is itself decisive, for what is more important is that the discussions about insurance reflected the mutual understanding of the parties as to their—not their insurers'—obligations.