**ICC LEASING CORPORATION,**
Respondent,

v.

**MIDWESTERN MACHINERY COMPANY, Appellant,**

**Thomas L. MacKrell, Defendant.**

**No. 46945.**

Supreme Court of Minnesota.

Aug. 5, 1977.

Rehearing Denied Sept. 22, 1977.

Lindquist & Vennum and William C. Mortensen and Kurtis A. Greenley, Minneapolis, for appellant.

Maun, Hazel, Green, Hayes, Simon & Aretz and Richard D. Donohoo, St. Paul, for respondent.

Heard before ROGOSHESKE, PETERSON, and MacLAUGHLIN, JJ., and considered and decided by the court en banc.

MacLAUGHLIN, Justice.

Plaintiff, ICC Leasing Corporation (ICC), brought this action against defendant Midwestern Machinery Company (Midwestern) pursuant to Midwestern's written agreements to purchase certain equipment leased by ICC to Northland Automatic Products, Inc. (Northland) upon Northland's default. ICC also brought suit against defendant Thomas L. MacKrell, Northland's president, upon his personal guarantees of the leases, but prior to trial ICC settled with MacKrell for $7,500. The case was tried without a jury and the trial court awarded judgment to ICC for $43,160.79. We affirm in part and reverse in part.

ICC, a Minnesota corporation engaged in financing and leasing personal property and equipment, planned to execute two lease agreements with Northland. Under the terms of these agreements, Northland was to lease various pieces of equipment from ICC for a term of 5 years, with 60 equal monthly payments to be made by Northland. Uncertain of Northland's financial

condition, ICC sought guarantees of the leases from Northland's president, MacKrell, and from Midwestern, a Minnesota corporation in the business of selling new and used machine tools and equipment and with which ICC had had business dealings in the past.

On January 5, 1970, before executing the lease agreements with Northland, John R. Myhr, a sales representative of ICC, went to the office of Clarence J. O'Heron, secretary of Midwestern, to discuss Midwestern's purchase of the equipment in the event of Northland's default on its lease payments. Although O'Heron testified at trial that he had not intended to guarantee the lessee's rental agreements but only ICC's net investment (purchase price) in the equipment, it was undisputed that O'Heron dictated and signed two letter agreements which stated:

> "With reference to your Lease * * * a copy of which is attached hereto to Northland Automatic Products, Inc., Lessee, in consideration of the right to purchase said equipment at the end of the lease for not to exceed 10% of its original value, we agree to purchase this equipment for the principal balance due at any time of default during the term of this lease."

After obtaining Midwestern's letter agreements ICC proceeded to lease the equipment to Northland, but by July of that year Northland was in default on both leases. ICC notified Northland of the default by letter of July 7, 1970, declaring the entire unpaid balance of $330,847.28 due and payable. On the same date, ICC notified Midwestern of Northland's default and demanded payment of the "unpaid principal balances" on the leases, pursuant to the letter agreements. The amount ICC demanded from Midwestern was stated to be $228,781.97, a sum arrived at by applying the Rule of 78's [1] to the entire unpaid bal-

ance of the Northland leases, thereby reducing Midwestern's obligation by the amount of the unearned lease service charges which would have become payable after Northland's default.

On July 21, 1970, ICC authorized Midwestern to take immediate possession of the equipment and to purchase it in accordance with the letter agreements. Midwestern took possession of the equipment and proceeded to sell it to various purchasers over the next 8 months. Midwestern subsequently remitted the net proceeds of those sales to ICC and, in addition, made several monthly rental payments.

After June 1973, Midwestern refused to make further payments and ICC brought suit against Midwestern and against MacKrell. After the claim against MacKrell was settled, the action against Midwestern was tried by the court. The trial court ordered judgment for ICC in the amount of $43,-160.79, including prejudgment interest at the rate of 8 percent, and Midwestern appealed from the judgment and from the denial of its motion for a new trial.

Midwestern raises three issues on appeal: (1) Whether the trial court properly found that Midwestern's letter agreements contained an ambiguous term; (2) whether the meaning of the phrase "principal balance due at any time of default" was properly construed by the trial court; and (3) whether the trial court properly awarded ICC prejudgment interest computed at 8 percent.

■ 1. The central issue for consideration by the trial court was the proper interpretation of the following phrase which was part of the letter agreements, dictated and signed by O'Heron:

> " * * * [I]n consideration of the right to purchase said equipment at the end of the lease for not to exceed 10% of its original value, *we agree to purchase*

---

1. The Rule of 78's is a sum-of-the-digits method of allocating interest charges where a debtor defaults or prepays a loan. It is applied for purposes of refund calculation where payments are to be made in equal installments, as if the amount of each installment contains a decreas-

ing amount of interest. The name "Rule of 78's" is derived from the fact that this formula is frequently applied to 1-year loans, payable in 12 equal monthly installments and the sum of the numbers 1 through 12 is 78.

*this equipment for the principal balance due at any time of default during the term of this lease.*" (Emphasis supplied.)

Midwestern acknowledged that it had signed the agreements, but argued that it had agreed to guarantee only ICC's net investment in the equipment leased to Northland. Midwestern contended that the word "principal" referred to only the purchase price paid by ICC for the equipment and that the sum total of all payments made by Northland before the default and all payments made by Midwestern and MacKrell after the default should have been credited against ICC's net investment in the leased equipment.

However, ICC contended that Midwestern had agreed to guarantee Northland's entire obligation under the leases. ICC argued that the lease payments made by Northland before default could not have been attributed solely to ICC's net investment in the equipment since Northland's monthly rental payments had included amounts for sales taxes, interest charges, and expenses of administration. Further, ICC stated that a portion of Midwestern's payments to ICC after Northland's default was attributable to interest accruing on Midwestern's unpaid obligation.

The trial court determined that the threshold question was whether the phrase in controversy was ambiguous. Whether or not a contract is ambiguous and thus open to construction presents, in the first instance, a question for legal determination by the trial court. On appeal, we must decide whether the trial court was correct in finding ambiguity and, if so, whether proper interpretation was given to the language used by the parties. *Employers Liability Assurance Corp. v. Morse,* 261 Minn. 259, 111 N.W.2d 620 (1961).

A writing is ambiguous if, judged by its language alone and without resort to parol evidence, it is reasonably susceptible of more than one meaning. *Metro Office Parks Co. v. Control Data Corp.,* 295 Minn. 348, 205 N.W.2d 121 (1973). In the instant case it seems clear, and we agree with the trial court, that the phrase used in the letter agreements was open to contrary interpretations and is, therefore, ambiguous.

■ 2. The trial court's determination that the phrase was ambiguous required resort to extrinsic evidence offered in aid of its interpretation. Although preliminary negotiations cannot be allowed to contradict or vary the plain terms of a written contract, where such contractual terms or words are ambiguous or reasonably susceptible of more than one meaning, precontract negotiations may be considered in order to determine the meaning and intent of the parties. *Paul W. Abbott, Inc. v. Axel Newman H. & P. Co. Inc.,* 282 Minn. 493, 166 N.W.2d 323 (1969); *Wick v. Murphy,* 237 Minn. 447, 54 N.W.2d 805 (1952).

Evidence of the parties' conversations and conduct during these preliminary negotiations was properly admitted by the trial court to aid in the construction of the contract. *Kehne Electric Co., Inc. v. Steenberg Const. Co.,* 287 Minn. 193, 197, note 5, 177 N.W.2d 309, 311 (1970). O'Heron, the Midwestern officer who had written the letter agreements, testified that he had agreed to guarantee only ICC's purchase price, or net investment, for the equipment and not the entire lease agreement. However, O'Heron admitted that he had used the phrase "principal balance," the same term used in the letter, and which is now in dispute, in his conversation with Myhr during the preliminary negotiations to explain what Midwestern intended to pay upon Northland's default.

Myhr testified that although he did not recall the details of what had been said at the time of the preliminary negotiations, it was his understanding that the phrase in question meant a purchase of the equipment for the unpaid gross rentals owed by Northland upon default. Three witnesses for ICC, who were experienced in the leasing industry, gave testimony that the words "principal balance" are used in the trade to mean the remaining unpaid rentals due. Further, ICC offered as evidence of its interpretation of the phrase two lease applications and two credit approval forms drawn up in connection with these same

Northland leases, in which ICC had noted Midwestern's agreement to repurchase the equipment for "net balance."

Based on this evidence, the trial court found that the word "balance" had been used as a noun not only in the disputed phrase, but in the other documents describing Midwestern's agreement to purchase the equipment in the event of Northland's default. The word "principal" was found by the trial court to be an adjective, meaning "chief" or "main," and used to qualify the word "balance." In considering the controversial phrase, the trial court found that the phrase "principal balance due at any time of default" referred to the amount owed by Northland pursuant to its obligations as lessee, and that Midwestern, by the use of this phrase in the letter agreements, had indicated its intention to purchase the equipment for whatever Northland owed upon default during the term of the leases.

The trial court also relied on the well-established rule of construction that when a contract is open to two conflicting interpretations, the one more favorable to the party who did not draft the instrument should be adopted in the absence of a clear showing that a contrary meaning was intended by the parties at the time of its execution. 17A C.J.S. Contracts § 324; Restatement, Contracts, § 236(d). The trial court found that since Midwestern had failed to prove by a fair preponderance of the evidence that O'Heron had fully explained the meaning of the phrase in question to ICC's agent, Myhr, all doubts or ambiguities must be resolved against Midwestern as drafter of the agreements.

In *Wisconsin Town Lot Co. v. Astleford,* 301 Minn. 331, 334, 222 N.W.2d 285, 287 (1974), we stated that a contract drafted by the vendor of property should be interpreted most favorably toward the purchasers of land, reasoning:

> "Plaintiff in drafting this provision could have stated clearly that the apportionment related to the taxes due in the year of the delivery of the deed. Because the contract does not clearly say this, and because it is fairly susceptible of the con-

trary interpretation, we believe that the interpretation more favorable to the party which did not draft the instrument, i. e., defendants, should be adopted. *Koch v. Han-Shire Investments, Inc.,* 273 Minn. 155, 140 N.W.2d 55 (1966)."

See, also *Beattie v. Product Design & Engineering, Inc.,* 293 Minn. 139, 198 N.W.2d 139 (1972); *Naftalin v. John Wood Company,* 263 Minn. 135, 116 N.W.2d 91 (1962).

When the evidence of the parties as to what was intended by a written instrument is in conflict, the problem of resolving this conflict rests with the trial court when it sits as trier of fact. *Wiseth v. Goodridge Farmers E. & M. Co.,* 197 Minn. 261, 266 N.W. 850 (1936). The trial court's findings will be overturned only if upon review we are left with the definite and firm conviction that a mistake has been made. Rule 52.01, Rules of Civil Procedure; *In re Estate of Balafas,* 293 Minn. 94, 198 N.W.2d 260 (1972). The trial court's construction of the phrase in controversy was not clearly erroneous and will not be set aside by this court.

3. Testimony proffered by ICC at trial established that it was the common practice in the leasing industry to give a lessee or his guarantor the benefit of a credit of unearned rental charges which would become payable after default, computed by applying the Rule of 78's to the balance owed at the time of default. In the instant case, the Rule of 78's was applied as of July 21, 1970, the date Midwestern was authorized to take possession of the equipment, and established a net balance owed by Midwestern pursuant to its guarantee of Northland's obligations under the leases.

After the date of default, Midwestern made payments toward its obligation to ICC. These payments were credited by ICC against the net balance owed by Midwestern, and interest on the unpaid balance was added at a rate of 8 percent per annum, computed monthly.

Midwestern contends that the trial court erred by allowing prejudgment interest on its obligation to ICC since the

amount of indebtedness was in controversy and was therefore an unliquidated sum. We have adopted the position that even where a claim is unliquidated but is readily ascertainable by computation or by reference to generally recognized objective standards of measurement, interest should be allowed the same as for a liquidated claim. *Moosbrugger v. McGraw-Edison Co.,* 284 Minn. 143, 170 N.W.2d 72 (1969). A bona fide dispute as to the amount of damages should not bar the accrual of interest in all circumstances or a plaintiff's right to interest would depend merely upon the reasonableness of the defendant. *Lacey v. Duluth, Missabe & Iron Range Ry. Co.,* 236 Minn. 104, 51 N.W.2d 831 (1952).

In the instant case, the interest factor arose only because Midwestern contested its obligation and refused to pay the principal balance owed as of the date of default. In determining whether interest should be allowed the question was not whether the parties agreed on the amount of damages but whether Midwestern could have determined the amount of its potential liability from a generally recognized objective standard of measurement. *Potter v. Hartzell Propeller, Inc.,* 291 Minn. 513, 189 N.W.2d 499 (1971). Mere difference of opinion as to the exact amount of damages was not sufficient to excuse Midwestern from compensating ICC for loss of the use of its money from July 1970 until the judgment in 1975.

However, Midwestern properly states that the interest allowed should not have been computed at a rate in excess of the legal rate when a different rate had not been contracted for in writing.[2] In the absence of a written agreement which provides for a higher rate of interest, an amount in excess of 6 percent cannot be charged. *Wolpert v. Foster,* Minn., ·254 N.W.2d 348 (1977); *Blindman v. Industrial L. & T. Corp.,* 197 Minn. 93, 266 N.W. 455 (1936).

Because it appears the trial court allowed prejudgment interest in the amount of 8

percent, and since there was no written agreement between the parties providing for 8 percent interest, we must remand this case to the trial court for a determination of the proper amount of the judgment. The damages must be recomputed, allowing only for the legal rate of interest on the amount owed by Midwestern subsequent to July 21, 1970, offset by payments made by Midwestern from that date until judgment was entered.

Affirmed in part, reversed in part.

SHERAN, C. J., and KELLY, J., took no part in the consideration or decision of this case.

---

2. Minn.St. 334.01, subd. 1, provides in pertinent part: "The interest for any legal indebtedness shall be at the rate of $6 upon $100 for a year, unless a different rate is contracted for in writing; * * *."