RIVER VALLEY TRUCK CENTER, INC., Appellant,

v.

INTERSTATE COMPANIES, INC., d/b/a Interstate Detroit Diesel, Respondent.

No. A03–1273.

Supreme Court of Minnesota.

Sept. 29, 2005.

Robert L. Demay, Clare Ellen Tuyet Priest, Alison Crawford Archer, Leonard, Street & Deinard, Minneapolis MN, for Appellant.

Lee Alan Henderson, Minneapolis MN, for Respondent.

## OPINION

HANSON, Justice.

Respondent Interstate Companies, Inc., d/b/a Interstate Detroit Diesel, is the exclusive wholesale distributor of Detroit Diesel engines and parts in a region that includes Minnesota. Appellant River Valley Truck Center, Inc. sells heavy-duty trucks manufactured by International Truck and Engine Corp. and also was an authorized Detroit Diesel dealer. In 2002, International stopped offering Detroit Diesel engines as an option in its new heavy-duty trucks. In response, Interstate notified River Valley that its Detroit Diesel dealership agreements would not be renewed. River Valley brought an action under Minnesota's Heavy and Utility Equipment Manufacturers and Dealers Act (HUEMDA), Minn.Stat. §§ 325E.068–.0684 (2004), claiming that Interstate did not have "good cause" for nonrenewal. The district court denied River Valley's motion for permanent injunctive relief and entered summary judgment for Interstate. The court of appeals affirmed. *River Valley Truck Ctr., Inc. v. Interstate Cos., Inc.,* 680 N.W.2d 99 (Minn.App.2004). We likewise affirm.

As a wholesale distributor, Interstate appoints a network of Detroit Diesel dealers to engage in aftermarket operations relating to Detroit Diesel engines. Generally, any dealer for a truck manufacturer that offers Detroit Diesel engines as an option in its products is eligible to become a Detroit Diesel dealer. Historically, all of the major heavy-duty truck manufacturers offered their customers a choice of various engines, including Detroit Diesel, Cummins, and Caterpillar. Consequently, most of the heavy-duty truck dealers in Interstate's region became Detroit Diesel dealers.

For its International truck dealerships in Mankato and New Ulm, River Valley signed "Detroit Diesel Dealer Agreements" with Interstate to become an authorized Detroit Diesel dealer. Interstate renewed River Valley's dealership agreements through 2002. Under the dealership agreements, River Valley could purchase Detroit Diesel engines and parts at reduced dealer pricing and River Valley was authorized to perform warranty service work on Detroit Diesel engines.

In April 2002, as a result of a confluence of forces—a general downturn in the economy, global consolidation in the heavy-duty trucking industry, and new emission stan-

dards for diesel engines—International announced its decision to stop offering Detroit Diesel engines as an option in new trucks, effective in October 2002, and directed its dealers to "begin immediately converting [their] customers to Cummins or Caterpillar." Interstate acknowledges that International's decision to stop offering Detroit Diesel engines "was not met with approval" by many International dealers. According to Interstate, the Detroit Diesel Series 60 engine was "the number one selling heavy duty truck engine for 10 years." Many International dealers tried unsuccessfully to persuade International to reverse its decision.

In response to International's decision, in November 2002, Interstate notified River Valley and other International truck dealers in the region that their Detroit Diesel dealership agreements would not be renewed for 2003. The notice to River Valley explained that because of International's "decision not to offer the Series 60 engine after September 30, 2002," "your Dealership will no longer be able to meet" the sales and promotion responsibilities of the dealership agreements and "therefore you cannot be in compliance with the agreements."

■ River Valley requested that Interstate withdraw the notice of nonrenewal.

River Valley told Interstate that their dealership agreements were protected by HUEMDA, which provides that no equipment manufacturer "may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause." Minn.Stat. § 325E.0681, subd. 1 (2004).[1] River Valley claimed that Interstate did not have "good cause" to fail to renew the dealership agreements because Interstate's decision did not "relate to any act or omission by River Valley or, indeed, anything over which River Valley has control."

Interstate extended the termination date but refused to withdraw its notice of nonrenewal, continuing to maintain that International's decision not to include Detroit Diesel engines "makes it impossible for River Valley" to meet the obligations of a dealer to promote and sell Detroit Diesel products, and therefore "good cause exists to terminate the dealer agreements." Interstate informed River Valley that the dealership agreements would terminate on February 20, 2003, unless River Valley could establish a relationship with another truck manufacturer that included Detroit Diesel engines as part of its product offering.[2] River Valley was unable to establish such a relationship.

---

1. HUEMDA was enacted in 1989 to provide protection to heavy and utility equipment dealers with regard to their dealership agreements with heavy and utility equipment manufacturers, who have inherently superior economic power when negotiating dealership agreements. *Astleford Equip. Co. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 191 (Minn.2001); Act of May 26, 1989, ch. 267, §§ 1–6, 1989 Minn. Laws 907, 907–10. Interstate does not dispute the applicability of HUEMDA. For purposes of HUEMDA, the terms "heavy and utility equipment," "heavy equipment," or "equipment" mean "equipment and parts for equipment including but not limited to * * * trucks and truck parts."

Minn.Stat. § 325E.068, subd. 2(2) (2004); *see also* Minn.Stat. § 325E.068, subds. 6 & 7 (2004) (defining "truck" and "truck parts").

2. Interstate's initial notice of nonrenewal, dated November 18, 2002, did not provide 90 days' prior written notice of the nonrenewal and did not "provide that the dealer has until expiration of the notice period in which to cure a claimed deficiency," as required by HUEMDA under these circumstances. *See* Minn.Stat. § 325E.0681, subd. 2. In a subsequent letter from Interstate's counsel, Interstate extended the termination date to February 20, 2003.

River Valley brought this action against Interstate under HUEMDA, claiming that Interstate did not have good cause to terminate the dealership agreements. River Valley sought damages and attorney fees, as well as injunctive relief to prevent Interstate from terminating the dealership agreements. *See* Minn.Stat. § 325E.0684 (2004) (describing remedies available under HUEMDA).

River Valley moved for a permanent injunction, and Interstate cross-moved for summary judgment. The parties agreed that the district court could decide the issues summarily on the facts presented, without a trial, and the district court treated the two motions as cross-motions for summary judgment.[3] In an "Order for Judgment Re: Injunctive Relief," the district court denied River Valley's request for permanent injunctive relief and ordered that summary judgment be entered for Interstate. The district court concluded that Interstate had good cause to terminate the dealership agreements because River Valley had "participate[d] in driving Detroit Diesel out of business." However, the district court temporarily enjoined Interstate from terminating the dealership agreements pending the resolution of any appeals.

The court of appeals considered River Valley's appeal as one from summary judgment and affirmed, concluding Interstate had good cause for the nonrenewal of River Valley's dealership agreements. *River Valley Truck Ctr., Inc.*, 680 N.W.2d at 106–07. The court held that, "as a matter of law, good cause existed for Interstate to not renew its dealership agreements with River Valley," based on International's decision to stop offering Detroit Diesel engines as an option in new trucks and International's decision to encourage dealers to convert their customers from the purchase of Detroit Diesel engines to the purchase of other engines. *Id.* at 107.

We granted River Valley's petition for further review and focused our inquiry on (1) whether, as a matter of contractual interpretation, River Valley has failed to substantially comply with the dealership agreements such that good cause for nonrenewal may be found; and, if so, (2) whether, as a matter of statutory construction, Interstate was precluded by HUEMDA from relying on River Valley's noncompliance because it was the result of circumstances outside of River Valley's control. On appeal from summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *Vlahos v. R & I Constr. of Bloomington, Inc.*, 676 N.W.2d 672, 676–77 (Minn.2004).

### I.

We first examine Minn.Stat. § 325E.0681, subd. 1, which requires an "equipment manufacturer" such as Interstate to demonstrate "good cause" to "terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement." The statute defines "good cause" as a "failure by an equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement, if the require-

---

3. The record of the parties' agreements is not completely clear as to whether the court was to use a summary judgment standard (no genuine issues of material fact) or to weigh the evidence and make findings of disputed facts. Because the record does not clearly authorize the district court to resolve disputed fact issues on the basis of the written submissions, we will view the parties' agreements as authorizing the court to treat their motions as cross-motions for summary judgment.

ments are not different from those requirements imposed on other similarly situated dealers by their terms." *Id.*[4]

Interstate's notice of nonrenewal cited River Valley's noncompliance with "the specific Dealer requirements" in section 2.2.1 of the dealership agreements, entitled "Sales and Promotion Responsibilities," which provides:

Dealer shall actively and effectively promote the sale of Products and Parts to owners and users of Products and to other potential customers located in Dealer's Area of Responsibility. Dealer shall also advertise and promote its Dealer Operations and shall participate in sales, service and parts promotional programs recommended by Distributor and shall utilize and display reasonable quantities of literature and materials promoting Products and Parts.

If Dealer represents an OEM [original equipment manufacturer], Dealer shall promote the sale, and maintain in stock an appropriate number, of such OEM products equipped with Products.

The dealership agreements define an original equipment manufacturer (OEM) as "[a] manufacturer of vehicles or equipment which utilize or incorporate Products." "Products" are "[n]ew or remanufactured engines which are or have been marketed by or for Company [Detroit Diesel] and for which Dealer [River Valley] is appointed by Distributor [Interstate]." "Parts" are "[n]ew parts or remanufactured parts which are marketed by or for

[Detroit Diesel] for use on, or in connection with, Products."

■ Interstate first argues that River Valley failed to comply with the second paragraph of section 2.2.1, which, according to Interstate, requires River Valley to promote the sale of an OEM product that contains a Detroit Diesel engine. But the language in this paragraph is merely conditional, stating that if the dealer represents an OEM that offers Detroit Diesel engines, the dealer shall promote the sale and maintain in stock an appropriate number of such OEM products equipped with Detroit Diesel engines. This language cannot reasonably be read as a requirement that the dealer represent an OEM, and the sales and promotion responsibilities in this paragraph fall out of the agreements if the dealer does not represent an OEM that offers Detroit Diesel engines. Although River Valley did represent an "OEM," as defined in the agreements, when International was making trucks that could incorporate Detroit Diesel engines, International no longer qualifies as an "OEM" because new International trucks can no longer accommodate Detroit Diesel engines. Therefore, the sales and promotion responsibilities in the second paragraph of section 2.2.1 no longer apply to River Valley.

■ But we separately examine whether River Valley failed to comply with the requirement in the first paragraph of section 2.2.1 to "actively and effectively promote the sale" of new or remanufactured Detroit Diesel engines and new or remanu-

4. In addition, HUEMDA enumerates eight specific circumstances involving the dealer, which also may establish good cause, including (1) significant changes in the ownership structure of the dealer without the manufacturer's consent; (2) bankruptcy; (3) change in the dealer's location without the approval of the manufacturer; (4) default on security agreements with the manufacturer; (5) failure to operate for seven consecutive days; (6) conviction affecting the dealer's relationship with the manufacturer; (7) conduct that is injurious to customers or the general public; and (8) consistent failure to meet market penetration requirements. Minn.Stat. § 325E.0681, subd. 1(a)-(h). None of these circumstances is involved here.

factured Detroit Diesel parts. In the context of the entire dealership agreements, we conclude that the parties intended the two paragraphs of section 2.2.1 to be independent of each other. By stating that the "dealer shall" take certain actions, the first paragraph imposes absolute contractual duties. By using the word "if" to describe OEM representation, the second paragraph imposes conditional contractual duties. The absence of the condition that would trigger duties under the second paragraph does not relieve River Valley of its absolute duties under the first paragraph.

River Valley argues that it can fulfill the intent of the first paragraph without representing an OEM that offers Detroit Diesel engines because it can still sell Detroit Diesel parts and replacement engines to owners of trucks with Detroit Diesel engines, and can still perform warranty and other service work on trucks equipped with Detroit Diesel engines. But, when we view the agreements as a whole, we read the first paragraph as requiring River Valley to promote the sale of Detroit Diesel engines in each of two ways: (1) as part of the sale of new trucks to new owners and (2) through the sale of replacement engines to current owners. In fact, Interstate argues that the sale of new trucks with Detroit Diesel engines is the life blood of its business because, without it, the population of trucks requiring Detroit Diesel parts and service, or replacement engines, would ultimately dwindle to nothing.[5] Thus, River Valleys inability to sell new trucks with Detroit Diesel engines

prevents it from "actively and effectively" promoting the sale of such engines. And the fact that River Valley is able to comply with some other essential requirements of the agreements—i.e., selling replacement engines to current owners—does not eliminate good cause for nonrenewal if it cannot comply with this essential requirement.

It is true that the dealership agreements did not require River Valley to meet a specific quota of sales of Detroit Diesel engines or prohibit River Valley from selling trucks that included other engines. In other words, River Valley's duty to "actively and effectively promote the sale of [Detroit Diesel engines]" was not made exclusive by the agreements, which allow River Valley to also promote the sale of other engines. In fact, when River Valley was initially made a dealer it was known that it sold International Trucks that could also contain Cummins or Caterpillar engines, at the customer's choice.

But the critical distinction is that before International decided to eliminate Detroit Diesel engines from its trucks, River Valley could promote the inclusion of Detroit Diesel engines in its International Truck sales. Now, it cannot. After October 2002, so long as River Valley represents International as its sole OEM, River Valley cannot possibly promote the sale of Detroit Diesel engines in new truck sales. To the contrary, International specifically directed River Valley to "begin immediately converting your customers to Cummins or Caterpillar engines."[6]

---

5. As Interstate points out, distributors such as Interstate perform the majority of service on Detroit Diesel engines. Thus, while River Valley did Detroit Diesel warranty work totaling $70,000 in 2002, warranty work for all Interstate locations totaled $15 million. Interstate naturally depends on the ongoing sales of trucks with Detroit Diesel engines for its future service business.

6. As an example of the incapacitating effect that International's requirements would necessarily have on River Valley, Interstate provided evidence that on March 27, 2002, River Valley joined representatives of International and Cummins in a meeting with the owner of Schugel Trucking Company, River Valley's largest customer. The purpose of the meeting was to persuade Schugel to buy International

Accordingly, we hold as a matter of law that River Valley has failed to substantially comply with the dealership agreements.

## II.

■ River Valley argues that International's decision to stop offering Detroit Diesel engines as an option in its new trucks was beyond River Valley's control and therefore cannot constitute good cause for nonrenewal under HUEMDA. For support, River Valley references Minn. Stat. § 325E.0682(b)(4) (2004), which states that a manufacturer violates HUEMDA if it fails to renew a dealer "based on the results of a natural disaster, a labor dispute, or other circumstance beyond the dealer's control." We construe the words of a statute according to their plain meaning. *Astleford Equip. Co. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 188 (Minn.2001). The application of a statute to undisputed material facts presents a legal issue that we review de novo. *Lefto v. Hoggsbreath Enters., Inc.*, 581 N.W.2d 855, 856 (Minn.1998).

■ We disagree with River Valley's arguments for two reasons. First, we read the "other circumstance" language to only refer to a dealer's temporary inability to perform, such as that caused by a natural disaster. Second, we agree with the court of appeals that River Valley's failure to comply with the dealer agreements was not beyond its control because it could have cured its noncompliance by discontinuing its representation of International and/or establishing a relationship with another manufacturer that can accommodate Detroit Diesel engines.

By combining the catch-all "other circumstance" language with natural disasters and labor disputes, which typically involve circumstances of a temporary duration, it appears that the legislature did not intend that circumstances of a permanent or indefinite duration would be included within the scope of section 325E.0682(b)(4). This conclusion is bolstered by a decision from the Eighth Circuit Court of Appeals and by the language in similar statutes from neighboring states. *See S. Implement Co., Inc. v. Deere & Co.*, 122 F.3d 503, 508 (8th Cir.1997) (holding that changes in the manufacturer's relationship with the franchisee were not a "natural disaster" or among the "other circumstances beyond the dealer's control" that would trigger the application of the Arkansas Farm Equipment Retailer Franchise Protection Act, which is comparable to HUEMDA); *see also* Iowa Code § 322F.7(7)(a) (2004) (including drought, flood, and economic recession as among "conditions beyond the dealer's control"); N.D. Cent. Code. § 51–07–01.2(5) (2004) (including "sustained drought or other natural disaster in the dealership market area" as examples of a "circumstance beyond the farm equipment dealer's control").

This reading of section 325E.0682(b)(4) is also bolstered by the Wisconsin Supreme Courts interpretation of the Wisconsin Fair Dealership Law (WFDL), on which HUEMDA was apparently patterned. *See Astleford Equip. Co.*, 632 N.W.2d at 188 (examining Wisconsin precedent regarding language similar to HUEMDA). In *Ziegler Co., Inc. v. Rexnord, Inc.*, decided one year before HUEMDA took effect in Minnesota, the Wisconsin court held that an equipment manufacturers changed economic circumstances can constitute "good cause" for altering its relationship with its dealers and for failing to renew a dealership

trucks with Cummins engines. Following the meeting, Schugel ordered 65 International

trucks with Cummins engines from River Valley.

agreement with any dealer who refuses to comply with the manufacturers changes, as long as the changes are essential, reasonable and nondiscriminatory. 147 Wis.2d 308, 433 N.W.2d 8, 11–12 (1988); *accord Morley–Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 377 (7th Cir.1998). The purpose of WFDL, according to the Wisconsin court, was to "equalize the power of grantors and dealers," and not "to insulate dealers from all economic reality." *Ziegler Co., Inc.*, 433 N.W.2d at 12. The court rejected the argument that a manufacturer "must subordinate those problems—regardless how real, how legitimate, or how serious—in all respects and permanently if the dealer wishes to continue the dealership." *Id.* at 11. The court noted that "the Wisconsin legislature could not have intended to impose an eternal and unqualified duty of self-sacrifice upon every grantor that enters into a distributorship-dealership agreement." *Id.*

We find the reasoning of the Wisconsin court to be persuasive. Requiring Interstate to put River Valley's interests ahead of its own, perhaps permanently, appears to be contrary to the purpose of HUEMDA and would effectively eliminate the authority given to manufacturers in HUEMDA to not renew for "good cause." *See* Minn.Stat. § 325E.0681. We conclude that the actions of International permanently, or at least indefinitely, made it impossible for River Valley to comply with the requirement to promote the sale of Detroit Diesel engines in new trucks so long as International is its only OEM.

█ Further, we agree with the court of appeals' observation that the actions of International prevented River Valley from complying with the dealer agreements only so long as International was River Valley's sole OEM. Those actions did not prevent River Valley from discontinuing its representation of International and seeking to represent another OEM that included Detroit Diesel engines in new trucks. It may well be, as the dissent argues, that this was not a practical or desirable solution for River Valley, but that does not mean that it was beyond River Valley's control. Thus, even though River Valley could not control International, it did have the theoretical ability to return to compliance with the dealer agreements by securing another OEM. This was the cure specified in Interstate's notice of nonrenewal.

For these reasons, we hold that HUEMDA does not preclude Interstate from basing the nonrenewal of River Valley's dealership agreements on the inability of River Valley to sell new trucks that contain Detroit Diesel engines.

Affirmed.

Dissenting, ANDERSON, RUSSELL A., PAGE, JJ., and BLATZ, C.J.

ANDERSON, RUSSELL A., Justice (dissenting).

I respectfully dissent. To reach the conclusion that the dealership agreement requires River Valley to represent an OEM that offers Detroit Diesel engines, the majority ignores established principles of contract interpretation by (1) considering the sales and promotion responsibilities in the first paragraph of section 2.2.1 in isolation from the rest of the dealership agreement; (2) treating the failure to satisfy a conditional obligation as a breach; (3) rendering conditional language that specifically addresses a dealer's representation of an OEM meaningless; and (4) resolving any conflict or ambiguity in the agreement against the dealer rather than the manufacturer that drafted the agreement. To reach the conclusion that Interstate may base its decision to terminate the dealership agreement on the actions of a third party, the majority disregards plain

statutory language that prohibits a manufacturer from attempting to terminate a dealership agreement based on a circumstance beyond the dealer's control, adds its own temporal qualifying language to the statute, renders the cure provision in the statute meaningless, and favors the manufacturer, Interstate, over the dealer, River Valley, whose interests the legislature was seeking to protect.

## I.

I agree with the majority that the second paragraph of section 2.2.1 of the dealership agreement does not require River Valley to represent an OEM that offers Detroit Diesel engines. This paragraph provides:

> If Dealer represents an OEM, Dealer shall promote the sale, and maintain in stock an appropriate number, of such OEM products equipped with Products.

Representation of an OEM is expressed as a condition in this paragraph, not as an absolute requirement. Because River Valley no longer represents an OEM, the conditional requirement of promoting the sale of OEM products equipped with Detroit Diesel engines has no application to River Valley.

I disagree, however, with the majority's interpretation of the first paragraph of section 2.2.1, which provides:

> Dealer shall actively and effectively promote the sale of Products and Parts to owners and users of Products and to other potential customers located in Dealer's Area of Responsibility. Dealer shall also advertise and promote its Dealer Operations and shall participate in sales, service and parts promotional programs recommended by Distributor and shall utilize and display reasonable quantities of literature and materials promoting Products and Parts.

Examining this paragraph "separately," the majority concludes that River Valley cannot fulfill the intent of this paragraph without representing an OEM that offers Detroit Diesel engines. The majority's interpretation effectively requires River Valley to represent an OEM so that it can promote the sale of new trucks equipped with Detroit Diesel engines, even though it acknowledges that other language in this same section that actually addresses a dealer's representation of an OEM is merely conditional and "cannot reasonably be read as a requirement that the dealer represent an OEM."

The majority's construction of section 2.2.1 cannot be reconciled and violates basic rules of contract construction. "The cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract." *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn.1997). "We construe a contract as a whole and attempt to harmonize all clauses of the contract." *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn.1990). Phrases and sentences cannot be dissected and read separately and "out of context with the entire agreement." *Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 352, 205 N.W.2d 121, 124 (1973). "Because of the presumption that the parties intended the language used to have effect, we will attempt to avoid an interpretation of the contract that would render a provision meaningless." *Chergosky*, 463 N.W.2d at 526; *see also Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn.1995) ("A contract must be interpreted in a way that gives all of its provisions meaning.").

By using the conditional "if" language in the second paragraph of section 2.2.1—"If Dealer represents an OEM"—it seems

**164**

clear that Interstate contemplated that there would be Detroit Diesel dealers that represent an OEM and Detroit Diesel dealers that do not represent an OEM.[1] Consequently, by making the sales and promotion responsibilities in the first paragraph applicable to all dealers, not just those dealers that represent an OEM, Interstate must have intended that dealers could fulfill those responsibilities without representing an OEM. In fact, Interstate's president testified at his deposition that he was not aware of any specific reason that River Valley could not continue to actively and effectively promote the sale of Detroit Diesel parts and replacement engines, either new or remanufactured, to current owners and users of Detroit Diesel engines. The "primary intent" of the dealership agreement, as stated in the agreement itself, is "to provide Product users with convenient and quality sales and service availability." River Valley can fulfill this intent without representing an OEM that offers Detroit Diesel engines. River Valley can still sell Detroit Diesel parts and replacement engines to owners of trucks with Detroit Diesel engines, and River Valley can still perform warranty and other service work on trucks equipped with Detroit Diesel engines.[2] Although River Valley can no longer promote the sale of new International trucks equipped with Detroit Diesel engines, the majority appears to acknowledge that these responsibilities, which are specifically described

in the second paragraph of section 2.2.1, "fall out of the agreement[ ] if the dealer does not represent an OEM that offers Detroit Diesel engines," and the majority appears to agree that these responsibilities "no longer apply to River Valley."

The majority makes no attempt to reconcile its conclusions that the first paragraph of section 2.2.1 requires dealers to represent an OEM and promote the sale of OEM products equipped with Detroit Diesel engines while the second paragraph—the paragraph that specifically addresses the representation of OEMs and the promotion of OEM products—does not. The majority tries to dodge the conflict by finding that "the parties intended the two paragraphs of section 2.2.1 to be independent of each other." The two paragraphs may impose independent duties, but that is beside the point. The majority offers no explanation why the dealership agreement would contain two sets of duties—one set of "absolute contractual duties" under the first paragraph that apply to all dealers and one set of "conditional contractual duties" under the second paragraph that apply only to those dealers that represent an OEM—if the dealership agreement effectively requires all dealers to represent an OEM.

Further, the majority interprets the dealership agreement to provide that a dealer is in breach of the agreement any time the condition of representing an OEM

---

1. The provision in section 2.2.1 is not an isolated reference to a dealer's representation of an OEM. Other provisions of the agreement similarly use the conditional "if" language. For example, in addressing the training responsibilities of a Detroit Diesel dealer, the agreement states: "*If Dealer represents an OEM*, Dealer shall employ a sales force adequately trained regarding the essential sales features and application guidelines of Products used in OEM's Products." (Emphasis added.)

2. For example, Interstate stipulated that Detroit Diesel "has never taken steps to prevent or discourage an on-highway Detroit Diesel distributor from selling Detroit Diesel engines (new or remanufactured) or replacement parts to a dealer for resale to owners and users of trucks equipped with Detroit Diesel engines but not produced or sold by the OEM(s) that the dealer represents." Consequently, River Valley's sales of Detroit Diesel engines are not necessarily restricted to International customers.

is not met. The majority's construction turns the failure to satisfy a conditional obligation into a breach of the agreement. Such an interpretation violates simple, established principles of contract construction. *See* 17A Am.Jur.2d *Contracts* § 459 (2004) (stating that the "nonoccurrence of a condition" is generally not a breach); Richard A. Lord, *Williston on Contracts* § 38:5 (4th ed.2000) (explaining the distinction between promises and conditions).

If Interstate actually had intended to require all dealers to represent an OEM, Interstate would not have offered a dealership agreement containing the conditional "if" language, and the dealership agreement would not contain "conditional" duties relating to the sale and promotion of OEM products, which apply only to those dealers that represent an OEM. If "the sale of new trucks with Detroit Diesel engines is the life blood" of Interstate's business, as the majority seems to have accepted, Interstate should have included it as a requirement in the dealership agreement. We are required to determine the meaning of "what is written in the instrument, not what was intended to be written." *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974).[3]

By examining the language in the first paragraph of section 2.2.1 "separately," the majority improperly dissects the first paragraph from the rest of the agreement. By interpreting the agreement as requiring all dealers to represent an OEM and requiring all dealers to promote the sale of OEM products, the majority renders the second paragraph of section 2.2.1 meaningless. There is no longer a condition or a conditional obligation relating to OEM representation and OEM sales—only a requirement and an absolute obligation. *See Telex Corp. v. Data Prods. Corp.*, 271 Minn. 288, 293, 135 N.W.2d 681, 685 (1965) (noting that "[i]t is an elementary principle of law that a contract must be construed as a whole," and "[t]he intention of the parties must be gathered from the entire instrument and not from isolated clauses") (quotation omitted).

Even accepting the majority's determination that "River Valley's inability to sell new trucks with Detroit Diesel engines prevents it from 'actively and effectively' promoting the sale of such engines," there is, at best, a conflict or ambiguity in the agreement, because the second paragraph only requires the dealer to promote the sale of OEM products equipped with Detroit Diesel engines if the dealer represents an OEM. Either way, the dealership agreement cannot reasonably be interpreted as requiring River Valley to represent an OEM.

**3.** As evidence of "the incapacitating effect" of International's decision, the majority cites a March 27, 2002, sales meeting, where representatives of River Valley, International, and Cummins met with the owner of Schugel Trucking Company, and Schugel subsequently ordered 65 International trucks with Cummins engines from River Valley. However, faced with International's decision to stop offering Detroit Diesel engines as an option in new trucks, River Valley had no choice but to sell trucks with engines by other manufacturers, as River Valley had done for years— including trucks sold to Schugel—with no complaints from Interstate. Although Interstate contends that the sale of new trucks is "critical to River Valley's right to maintain its International dealership," Interstate did not even collect data regarding dealers' sales of new trucks equipped with Detroit Diesel engines and before 2001 had never terminated a dealership agreement based on the dealer's failure to sell an adequate number of trucks equipped with Detroit Diesel engines. Moreover, Interstate acknowledges that there are "many other" Detroit Diesel dealers in the southern Minnesota market. The next year, Schugel purchased 65 Freightliner trucks with Detroit Diesel engines.

When there is an apparent conflict in contract provisions, "contract construction compels us to determine that the more specific language takes precedence over the more general language." *Bank Midwest, Minn., Iowa, N.A. v. Lipetzky,* 674 N.W.2d 176, 181 n. 8 (Minn.2004). We also have noted "the well-established rule of construction that when a contract is open to two conflicting interpretations, the one more favorable to the party who did not draft the instrument should be adopted." *ICC Leasing Corp. v. Midwestern Mach. Co.,* 257 N.W.2d 551, 555 (Minn.1977). In this case, the agreement was Interstate's, not River Valley's. Therefore, the court must construe the agreement in favor of River Valley, and the court must give precedence to the second paragraph of section 2.2.1, which treats a dealer's representation of an OEM as a condition and treats the sale and promotion of OEM products as a conditional responsibility.

The same result is reached if the dealership agreement contains ambiguous language. *See Art Goebel, Inc.,* 567 N.W.2d at 515 (explaining that "[a] contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation"). Although the interpretation of an ambiguous contract is ordinarily a question of fact for the jury, *Denelsbeck v. Wells Fargo & Co.,* 666 N.W.2d 339, 346 (Minn.2003), in this case, the parties agreed that the district court could decide the issues summarily on the facts presented, without the need for a trial. Therefore, the court must construe any ambiguity in the contract language regarding the representation of an OEM and the promotion of the sale of OEM products in favor of River Valley. *See Hilligoss v. Cargill, Inc.,* 649 N.W.2d 142, 148 (Minn.2002) (stating that "ambiguous contract terms must be construed against the drafter").

I cannot interpret the dealership agreement to impose a requirement, let alone an essential requirement, on River Valley to promote the sale of OEM products when the agreement specifically uses conditional, not absolute, language with regard to that requirement. Accordingly, I conclude that Interstate has not established that River Valley failed to substantially comply with an essential requirement in the dealership agreement, and Interstate did not have "good cause" under HUEMDA to terminate the dealership agreements.

II.

I also disagree with the majority's determination that Interstate can base its decision to terminate River Valley's dealership agreements on International's decision to stop offering Detroit Diesel engines where it is undisputed that River Valley had no control over International's decision. Interstate has stipulated that it "made a decision not to renew International truck dealers as overhaul dealers after the end of 2002" "[a]s a result of International's decision to drop the Detroit Diesel engine as an option on all new International trucks." There is no evidence that River Valley played any role in International's decision to discontinue offering Detroit Diesel engines. In fact, Interstate admits that many International dealers, including River Valley, unsuccessfully tried to persuade International to reverse its decision.

HUEMDA provides that an equipment manufacturer such as Interstate cannot "attempt or threaten to terminate" a "dealership agreement if the attempt or threat is based on the results of a natural disaster, a labor dispute, or other circumstance beyond the dealer's control." Minn.Stat. § 325E.0682(b)(4) (2004). HUEMDA also provides that the manufacturer's notice of termination, cancellation, or nonrenewal of the dealership agreement "must provide

that the dealer has until expiration of the notice period in which to cure a claimed deficiency." Minn.Stat. § 325E.0681, subd. 2 (2004). "If the deficiency is rectified within the notice period, the notice is void." *Id.*

The majority does not dispute that the actions of International that led to the termination of River Valley's dealership agreements were outside the control of River Valley; however, the majority nonetheless concludes that International's actions do not constitute a "circumstance beyond the dealer's control" within the meaning of Minn.Stat. § 325E.0682(b)(4). To reach this conclusion, the majority interprets the statutory language "circumstance beyond the dealer's control" to encompass only temporary circumstances and not "circumstance[s] of a permanent or indefinite duration." This interpretation has no support whatsoever in the plain language of the statute, the statutory scheme, or the purpose of HUEMDA.

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2004). If the legislature had intended to limit the "circumstances" in section 325E.0682(b)(4) to temporary circumstances, it easily could have included language to that effect. The legislature did not, and the rules of statutory construction forbid us from adding words to a statute. *Genin v.1996 Mercury Marquis*, 622 N.W.2d 114, 119 (Minn.2001). Further, this language is unworkable as a practical matter, because it often will be difficult to determine if the circumstance that threatens a dealership agreement involves only a "temporary inability to perform" or an indefinite or permanent inability to perform.

The majority's interpretation of section 325E.0682(b)(4) also is inconsistent with the statutory scheme. If the reason for the manufacturer's action relates to a circumstance beyond the dealer's control—whether temporary or permanent—the dealer will have no meaningful opportunity to cure the claimed deficiency. This would render the cure provision "meaningless, in violation of the canon of statutory construction that each provision in a statute is to be given meaning." *MBNA Am. Bank, N.A. v. Comm'r of Revenue*, 694 N.W.2d 778, 780 (Minn.2005); *see* Minn.Stat. § 645.16 (2004).[4] In addition, the majority's narrow construction of "circumstance beyond the dealer's control" in section 325E.0682(b)(4) subverts the remedial "purpose of HUEMDA," which is "to protect the dealer." *Astleford Equip. Co. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 191 (Minn.2001) (noting that HUEMDA was enacted to provide protection to heavy and utility equipment dealers with regard to their dealership agreements with heavy and utility equipment manufacturers, who have inherently superior economic power in the negotiation of dealership agreements).

The majority's interpretation of HUEMDA relies heavily on the Wisconsin Supreme Court's interpretation of the Wisconsin Fair Dealership Law. Like HUEMDA, the Wisconsin Fair Dealership Law requires "good cause" to terminate a dealership agreement. However, the majority fails to mention that the Minnesota statute is materially different from the

---

4. The "notice and right to cure provisions" do not apply if the reason for the termination, cancellation, or nonrenewal is for any reason set forth in section 325E.0681, subd. 1(a)-(g). Minn.Stat. § 325E.0681, subd. 2. The majority agrees that "[n]one of these circumstances are involved here." This provision demonstrates that the legislature knew how to limit the applicability of the cure provision. *See* Minn.Stat. § 645.19 (2004) ("Exceptions expressed in a law shall be construed to exclude all others.").

Wisconsin statute in terms of defining "good cause." *Compare* Minn.Stat. § 325E.0681, subd. 1, *with* Wis. Stat. § 135.02(4) (2004). The Wisconsin Fair Dealership Law measures good cause "by the dealer's substantial compliance with requirements 'imposed' or 'sought to be imposed by the grantor.' " *Ziegler Co. v. Rexnord, Inc.*, 147 Wis.2d 308, 433 N.W.2d 8, 12 (1988) (quoting Wis. Stat. § 135.02(4)(a)). As the Wisconsin Supreme Court observed, "[t]he phrase 'sought to be imposed' suggests legislative recognition that the grantor has some ability to change the dealership—some right on the part of the grantor to change its method of doing business with its dealers." *Ziegler*, 433 N.W.2d at 12. As the majority notes, *Ziegler* was decided one year before HUEMDA took effect in Minnesota, yet the Minnesota legislature chose not to pattern its definition of good cause on the Wisconsin statute. Instead, the legislature defined good cause as the dealer's failure "to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement," without specifically recognizing the right of the equipment manufacturer to change dealership requirements. Minn.Stat. § 325E.0681, subd. 1.

In addition, the majority concludes that River Valley could comply with the dealership agreement by discontinuing its representation of International or by representing another OEM that offers Detroit Diesel engines. To begin with, although the court of appeals somehow came to the conclusion that "River Valley could comply with paragraph 2.2.1 by no longer representing International," *River Valley Truck Ctr., Inc. v. Interstate Cos., Inc.*, 680 N.W.2d 99, 105 (Minn.App.2004), Interstate never gave River Valley the option of discontinuing its relationship with International. Rather, Interstate informed River Valley that to avoid termination, it needed to "establish[ ] a relationship with another OEM that sells DDC engines as part of its Product offering." Further, discontinuing the relationship with International would not enable River Valley to satisfy the purported contractual "requirement" of selling new trucks equipped with Detroit Diesel engines. Even if Interstate had attempted to impose this condition, it would violate HUEMDA. *See* Minn.Stat. § 325E.0682(b)(2) (2004) (stating that it is a violation of HUEMDA for an equipment manufacturer to "coerce an equipment dealer into a refusal to purchase the equipment manufactured by another equipment manufacturer"). I also fail to see how interpreting HUEMDA to permit a manufacturer to terminate a dealership agreement because the dealer does not take an action that will immediately destroy its business—in this case, requiring an International truck dealer to no longer be an International truck dealer—serves the purpose of affording " 'the dealership the opportunity to react and protect itself.' " *Astleford*, 632 N.W.2d at 190 (quoting *Jungbluth v. Hometown, Inc.*, 201 Wis.2d 320, 548 N.W.2d 519, 524 (1996)).

As for the option of representing another OEM that offers Detroit Diesel engines, the majority states that "even though River Valley could not control International, it did have the theoretical ability to return to compliance with the dealer agreements by securing another OEM." The majority ignores the undisputed fact that securing another OEM was a practical impossibility for River Valley in the less than 90–day time frame that Interstate provided.[5] In

---

**5.** Interstate's initial notice of nonrenewal, dated November 18, 2002, did not provide 90

days' prior written notice of the nonrenewal and did not "provide that the dealer has until

unimpeached and unrebutted affidavit testimony, the CEO of River Valley stated that River Valley attempted to obtain a second heavy-duty truck dealership that offered Detroit Diesel engines in new trucks, but no OEM was willing to appoint River Valley as a dealer. River Valley even attempted to obtain a dealership with an OEM that manufactures equipment incorporating Detroit Diesel engines, but no dealerships were available. Just as River Valley could not control International, it could not control other manufacturers. Therefore, compliance with the dealership agreement was not within River Valley's control where the opportunity to cure the claimed deficiency was not within River Valley's control.

The majority has distorted the language of the dealership agreement and the language of HUEMDA to reach the result that Interstate had "good cause" to terminate the dealership agreement. Perhaps this result makes sense from a policy perspective. However, it is not our role in this case to make policy. In enacting HUEMDA to protect dealers, the legislature already has weighed the policy considerations. In this case, our role is limited to basic contract construction and statutory interpretation. If the legislature believes that the result dictated by the contract and the statute in this case is not the right result, then the legislature can amend the statute accordingly and make it more like Wisconsin's Fair Dealership Law. It is not for this court to incorporate a requirement into the dealership agreement that is stated merely as a condition or to add language to a statute to reach what the court believes is the best result.

For these reasons, I would reverse the courts below and reinstate River Valley's claims.

BLATZ, C.J. (dissenting).

I join in the dissent of Justice Russell A. Anderson.

PAGE, J. (dissenting).

I join in the dissent of Justice Russell A. Anderson.

expiration of the notice period in which to cure a claimed deficiency," as required by HUEMDA under these circumstances. *See* Minn.Stat. § 325E.0681, subd. 2 (2004). In a subsequent letter from Interstate's counsel, dated December 10, 2002, Interstate extended the termination date to February 20, 2003, and indicated that "River Valley can cure its breach by establishing a relationship with another [original equipment manufacturer] that sells [Detroit Diesel] engines as part of its Product offerings."